Porter, Appellant, vs. Beattie and others, Respondents.

*April 16 — May 25, 1894.*

*Vendor and purchaser of lands: Fraudulent representations: Rescission.*

1. The purchaser of a farm in a part of the country with which he was unacquainted had a right to rely upon representations in a plat exhibited to him by agents of the vendor, purporting to show the location, quantity, and nature of the land, although he afterwards made a hasty inspection of the farm in company with such agents, and although they employed no artifice to prevent a full investigation, where such investigation was made at an unfavorable season and the falsity of the representations in the plat were not obviously discoverable.

2. The agents having known, before the sale was consummated, the falsity of the representations in the plat and that the purchaser was relying thereon, and not having informed him of the facts, such representations were fraudulent, even if made in the first instance through inadvertence or mistake.

APPEAL from the Circuit Court for *Columbia* County.

On and prior to May 16, 1892, the defendant *John Ehr* owned the farm in question, situated about two miles west of Portage City. Early in April, 1892, he applied to the defendant *William Beattie*, a real-estate agent in Portage City, to sell said farm, and agreed with him, in writing, that he would take $2,600 for the same, less two per cent. commissions to be paid to said *Beattie*, and that said *Beattie* might, in addition, have all he could get over and above $2,600. Thereupon *Beattie* employed a Mr. Unger, residing at Marshall, about four miles from Waterloo, to aid him in selling said farm at $4,000, and agreed to give him a commission, in case such sale was effected, of six per cent. Unger employed Thomas A. Williams, of Waterloo, to aid in selling said lands at said price, and agreed to give said Williams one half of said six per cent. commission in case he effected such sale, to wit, the sum of $120. Williams caused a notice to be published in the Waterloo Democrat,

April 22, 1892, which, omitting the portions applicable to other farms, read as follows, to wit: "Call at the office of T. A. Williams, and see plats for the following farms: . . . One farm, two miles from Portage, 272 acres, $4,000." Soon after the plaintiff in this action, having seen said notice in said newspaper, called on said Williams at his office, and by him was shown plat Exhibit A, purporting to represent the said farm. Said plat was in different colors,— one color representing plowed land; another color, marsh land; and another color, timber land. The lands so colored, and purporting to be the farm of said *Ehr*, are described as follows, to wit: The E. ½ of the N. E. ¼, and the N. E. ¼ of the S. E. ¼, *and the E. ½ of the N. W. ¼ of the N. E. ¼*, of section 3, all in township 12 N., of range 8 E.; also, thirty-two acres off the S. ½ of the S. E. ¼ and the E. ½ of the S. W. ¼, less eighteen acres lying north of the right of way of the Chicago, Milwaukee & St. Paul Railway Company, being in section 34, in township 13 N., of range 8 E.; *and also that part of the W. ½ of the S. W. ¼ of said section 34, lying south of said right of way*. At the bottom of said plat, and on the back thereof, was the following writing to wit: "The above contains 272 acres. About 120 under plow—balance timber and grass land. All fenced, mostly with wire. Land is nearly all first class. The hay land is estimated to cut 150 tons. Water on both parts, with a well at the house and well at the barn. House 16x28, two stories high. Frame barn, 24x52, with basement for cattle. Machine shed and other buildings. Buildings are new and first-class. Owner is very old, and has moved to the city. Price, $4,000. Payments can be arranged to suit purchaser."

Soon after the plaintiff visited said farm in company with said Williams and said *Beattie*. Thereafter, and on May 16, 1892, the said *Jòhn Ehr* and *Anna Maria Ehr*, his wife, executed a power of attorney to the said *William Beattie*,

Porter vs. Beattie and others.

to bargain, sell, and convey their farm in Columbia county, described as follows, to wit: " *The west fifteen acres of the southwest quarter of the northwest quarter, and the west fifteen acres of the northwest quarter of the southwest quarter of section numbered two (2)*; the east half of the northeast quarter and northeast quarter of southeast quarter; *and that part of east half of the northwest quarter lying north of the highway crossing the same, in section number 3;* all of the above being in township number twelve (12) north, of range number eight (8) east; also thirty-two acres off the south side of south half of southeast quarter and the east half of southwest quarter, less eighteen acres lying north of the right of way of the Chicago, Milwaukee and St. Paul Railway Company, being in section number thirty-four (34) in township number thirteen (13) north, of range number eight (8) east, containing 272 acres, be the same more or less," — which power of attorney was duly witnessed and acknowledged. On May 16, 1892, the said *John* and *Anna Maria Ehr* also executed a warranty deed of all the same premises described in said power of attorney, but the grantee's name therein, and the consideration thereof, were left blank therein, and which deed was duly witnessed with two witnesses, and acknowledged.

On May 19, 1892, the said *Beattie* completed the trade with the plaintiff, inserted his name as grantee in said deed, and delivered the same to him, and the said plaintiff at the same time paid to the said *Beattie* $1,000 in cash, and gave back to him two notes, secured by a mortgage on said premises; and thereafter the said *Beattie* paid to the said *John Ehr* the said $1,000, and also the sum of $1,548, and the said *John Ehr* thereupon assigned said notes and mortgage to the said *Beattie,* who has since held the same.

On August 15, 1892, the plaintiff claims to have discovered that he had been defrauded in the purchase of said land, and thereupon, and on November 23, 1892, he com-

menced this action to set aside said notes and mortgage and said deed, and to have his damages ascertained, assessed, and found, and for judgment against the defendants for the amount thereof, and that the same be adjudged to be a lien upon said lands so conveyed to the plaintiff, and for such other and further relief as to the court should seem just and equitable. The defendant *Beattie* answered the complaint by way of admissions and denials and counter allegations, and the said *John* and *Anna Maria Ehr* also answered in a similar way. The case coming on to be tried, the said plaintiff and his wife executed and acknowledged, in the presence of two witnesses who signed their names thereto as such, a deed of said premises so conveyed to them, and tendered the same back to the said *John Ehr* upon said trial, and offered the same in evidence, and the same is filed with the clerk of the court.

At the close of the trial, and on May 15, 1893, the court made its findings of fact and conclusions of law, among other things, to the effect that said *Beattie* was authorized by the said *John Ehr* to sell said lands, and to employ said Williams to assist in selling the same; that said Williams had a plat in his possession, as mentioned; that said plat was not an accurate description or representation of said farm, in several particulars; that the plaintiff saw said plat at the office of said Williams, in Waterloo, before he saw said lands; that he thereafter visited said lands, and was shown over said farm, and was given every opportunity to examine the same; that he was not shown any lands as belonging to the farm except such as in fact belonged to said farm; that the plat was not referred to in any way while the plaintiff was so examining said farm; that all the parties understood that the farm contained 272 acres, whereas the plat represented a considerable more than that amount; that the deed was made and mortgage given as stated; that the plaintiff purchased said lands from an actual in-

Porter vs. Beattie and others.

spection thereof; that he was not misled as to the farm by the error in said plat, nor influenced thereby; that the deed which he received correctly describes the farm so belonging to *Ehr*, and the lands so shown to the plaintiff, and no others. And as conclusions of law the court found that the plaintiff was not entitled to have the sale set aside, nor to judgment for damages, as demanded; that the complaint should be dismissed, but without costs to either party. From the judgment entered accordingly the plaintiff appeals.

For the appellant there were briefs by *Bushnell, Rogers & Hall*, and oral argument by *A. R. Bushnell* and *F. W. Hall*. To the point that, upon the facts, plaintiff was entitled to the relief sought, they cited *Risch v. Von Lillienthal*, 34 Wis. 256; *Kuelkamp v. Hidding*, 31 id. 503; *Middleton v. Jerdee*, 73 id. 39; *Miner v. Medbury*, 6 id. 295; *Smith v. Richards*, 13 Pet. 26.

*J. H. Rogers* and *H. T. Ames*, for the respondents.

CASSODAY, J. The trial court failed to find the value of the land conveyed. *Mr. Ehr* readily agreed to take $2,600 therefor, less two per cent. commission for making the sale. There is nothing to indicate that he ever expected to get any more, nor that in his judgment it was worth any more. There is some evidence that it was not worth as much. It seems quite certain that it was not worth any more.

*Beattie* was to have all he could get over the $2,600, as well as the commissions named. *Beattie* had been in the real-estate business at Portage for about thirty years. Living thus about two miles from the farm, and being in that business, we may fairly assume that he knew all about its value. It does not appear that *Beattie* made any attempt to sell the farm to any one living in the vicinity of it and likely to know its real quality, character, and value.

His first move toward selling the same, apparently, was to enlist Unger, of Marshall, Dane county, in the enterprise, presumably with the view of securing a purchaser in the vicinity of Unger's residence. The price was fixed by *Beattie* at $4,000, and Unger was to receive for his services in procuring such purchaser six per cent. on the sale, to wit, the sum of $240. Accordingly, *Beattie* and Unger had an interview, and *Beattie* furnished Unger with what purported to be a full description of the farm thus proposed to be sold, substantially as stated in Exhibit A, set forth in the foregoing statement, with the portion thereof constituting the plat having one color to express plow land, another to express hay land, and another to express timber land. *Beattie* at first testified that he never saw that plat, and did not know in whose handwriting Exhibit A was, and sought to create the impression that he was in no way responsible for anything contained in that exhibit. But on cross-examination he was finally compelled to testify to the effect that he wrote out a description of the land, and drew a plat thereof in different colors with pencils, representing the plow land, timber land, and hay land, and the line of the Chicago, Milwaukee & St. Paul Railroad and the Portage road, on it, and gave the same to Unger; that he had never tried to find that plat, although a copy of Exhibit A was served upon him with the complaint in this action; that he made the plat and statements he gave to Unger to sell the land, and as a kind of representation of the land; that he could not tell, at first, wherein the plat he so made differed from the one on Exhibit A, but finally did not think it represented the timber land north of the highway as extending so far west; that he gave to Unger all the statements contained in Exhibit A, except that the "buildings are new and first-class." These admissions were drawn from *Beattie* on cross-examination, in fragments, and were severally made with a hesitancy and prevarication indica-

tive of a conscious desire to suppress such facts as might be damaging to the defense. There is nothing to indicate that Unger knew anything about the land, except such knowledge as he obtained from *Beattie*. In fact, it does not appear that he was at that time a dealer in real estate, but the reverse.

Upon receiving the descriptions, plat, and statements from *Beattie*, Unger appears to have gone at once to Williams, a real-estate dealer at Waterloo, and engaged him to aid in finding a purchaser for the land, and agreed to give Williams therefor one half of his commissions,— that is to say $120; and he thereupon left with Williams Exhibit A, as a true description of the farm to be sold. Williams thereupon advertised in the Waterloo Democrat for those wishing to buy farms to call at his office and, among others, examine this plat. The plaintiff saw the notice, and in pursuance of it went to Williams' office. He was there shown Exhibit A, and examined it carefully. It presented an attractive bargain, and so the old man agreed with Williams to go with him and look at the farm. Unger resided only four miles from Waterloo; and, as he was not then in the real-estate business, it is fair to assume that he had already agreed with *Beattie* to put the matter in the hands of Williams to secure a purchaser. In fact the trial court finds that *Beattie* employed Williams to assist in selling the lands, and that "Williams had a plat in his possession purporting to represent the said farm," thereby referring to Exhibit A. We must assume that *Beattie* was the author of that plat and all that is contained in Exhibit A, and that he made and devised the same for the sole purpose of securing a purchaser of the farm at a price $1,400 higher than was asked by the owner.

With such knowledge as the plaintiff obtained from Williams and Exhibit A, he and Williams went to Portage. They got there in the afternoon, and after dinner they and

*Beattie* visited the farm.   At evening the plaintiff returned
to *Beattie's* house, and remained with him all night, but
did not agree to buy the farm until some days thereafter.
The plaintiff had never seen the farm, nor been in the
vicinity of it, before.   He knew nothing about it, there-
fore, except what he saw that afternoon, and what he was
told by *Beattie* and Williams, and the facts and representa-
tions made in Exhibit A.   The statement of facts and rep-
resentations contained in that exhibit were grossly and
confessedly false in several particulars.   The exhibit stated
that the farm contained 272 acres, whereas *Mr. Ehr* was
the owner of only 254 acres.   The exhibit described about
ninety-five acres which *Ehr* did not own, and this is found
as a fact by the trial court, the same being made up of the
two pieces described in italic letters in the portion of the
foregoing statement setting forth that exhibit.   The ex-
hibit only described 214 acres of the land which *Mr. Ehr*
did own, and entirely failed to describe or mention forty
acres which he owned; and this is found as a fact by the
trial court; and the same are described in the deed to the
plaintiff and in italic letters in the foregoing statement.
The railroad is located on the exhibit substantially in the
right place, but it falsely represents the Portage road or
public highway as running directly west on the town line
from the S. W. corner of the S. E. ¼ of section 34, whereas,
in truth and in fact, it runs some 30-odd degrees south of
west from that point, or a little east of it.   Between that
road and the town line on the north is a three-cornered
piece of land, containing about ten acres, on the north side
of the N. E. ¼ of the N. W. ¼ of section 3, mentioned in the
deed.   The land conveyed to the plaintiff extended south
of the town line for three quarters of a mile, the southern
end of which extends nearly to the river, and the south-
ern portion of the same is very much the poorest portion
of the farm; and there is where thirty acres is located

which was not described on Exhibit A.   Exhibit A de-
scribes the portion of the farm on  the north side of the
town line as extending from the east line of section 34 to
the west line of that section,— a  distance of one mile,—
with a strip twenty-five or thirty rods wide,along the west
side of the S. W. ¼ of the S. W. ¼ of section 34, designated
thereon as timber land, whereas, in truth and in fact, that
portion of the farm did not extend as far west, into eighty
rods; and along the west side of the E. ½ of the S. W. ¼ of
said section 34, and the west end of the ten-acre piece men-
tioned, is a strip of timber land  similar to that mentioned,
and east of that strip of timber was plow land.  The plaint-
iff went upon the plow land east of the timber.  He re-
peatedly asked where the lines were, and was each time
told to keep within the fences.  But there was no fence on
the west side, where the timber was located, and no one
appears to have pointed out to him the location of the west
line of the land in the timber.  It is said that at no time
while he was on the farm did he mention the plat or Ex-
hibit A.  But he had no occasion to mention it, since he
had been informed by it that the land extended from the
east line of the section to the west line of the section, and
he had the right to rely upon such representations.  In fact,
he had no means of disputing them, unless he measured the
distance, even had the west line of *Mr. Ehr's* lands been
pointed out to him, which was not done.  One of the worst
deceptions consisted in representing that a strip of land
eighty rods wide, west of *Mr. Ehr's* land, and belonging to
somebody else, was the property of *Mr. Ehr*, and then de-
scribing the west portion of it as timber land, the same as
was true in respect to *Ehr's* land.  Exhibit A also misrep-
resented the amount of the plow land, the quality of the
soil, etc., etc.

The plaintiff was at the time nearly seventy-three years
**of age**, and, seemingly, had always been a farmer.  He was

accompanied by two experienced real-estate dealers. He was a total stranger to the land, and his inspection of it was at a time of year not best calculated to discover its poverty of soil. He was approached and drawn into an inspection of the land, apparently, by indirection and circumvention, and upon representations which were grossly false and peculiarly deceptive. There were seven different pieces of land described in the deed. To a farmer not skilled in such matters it would be very difficult, unaided, even if shown the outside boundary lines, to apply such several descriptions to such a farm. That he relied upon the false representations contained in Exhibit A is apparent from the fact that, when he got his deed, he or his wife called upon Mr. Williams for the plat, and Mr. Williams gave Exhibit A to him, in the presence of *Beattie.* One thing is very certain: Either *Beattie* knew from the beginning that the description in Exhibit A was false, or else he ascertained the facts prior to May 16, 1892, when the power of attorney to *Beattie* and the deed from *Ehr* and wife were drawn, for they each accurately describe the 254 acres of land belonging to *Mr. Ehr,* and no other land. That was at least three days before the trade was consummated. *Beattie* and Williams both knew that the plaintiff had been induced by the false representations contained in Exhibit A to visit the land with a view of purchasing the same; and yet neither of them ever informed him or intimated to him that Exhibit A contained any such misrepresentations. If such misrepresentations in Exhibit A were made through some inadvertence or mistake and without any design to defraud, then they should have informed the plaintiff of the facts when they were ascertained and before the trade was consummated. But there is no pretense that they, or either of them, did so. Men are presumed to intend the ordinary and natural result and consequence of their own conduct. The natural tendency of such false

representations, so made to the plaintiff under the circumstances mentioned, was to defraud him into the purchase of the land at a very greatly exorbitant price. The object to be sought furnished a strong motive to perpetrate the fraud. Some of the false representations so made are expressly found by the court, and some of the others are established by the undisputed evidence. "Fraud is proved when it is shown that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it be true or false." *Montreal River Lumber Co. v. Mihills*, 80 Wis. 562, and cases there cited.

The trial court decided against the plaintiff apparently on the sole ground that he had, in law, no legal right to rely upon any of such misrepresentations, after having visited the premises and having had an opportunity of investigating such facts for himself. In *Castenholz v. Heller*, 82 Wis. 30, the purchaser, prior to the purchase, had in his possession a correct abstract and a true plat of the lots purchased, from which he might have learned the true boundary of such lots, yet it was held that he was not thereby precluded from recovery by reason of the false representations made. The mere fact that neither *Beattie* nor Williams nor the vendor, at the time the plaintiff inspected the farm, used any artifice to prevent or dissuade him from further investigating whether the statements and representations contained in Exhibit A were true or false, did not prevent the plaintiff from relying upon such misrepresentations, in so far as their falsity was not obviously discoverable by him. *Gunther v. Ullrich*, 82 Wis. 222; *McKinnon v. Vollmar*, 75 Wis. 82. We must hold that the sale was procured by false representations, upon which the plaintiff relied, to his great damage; and that he is entitled to a rescission of the same. The defendants must surrender the notes and mortgage for cancellation, and in case of their transfer to a

*bona fide* purchaser the defendants must amply protect the plaintiff against any loss from the same. The defendants must also repay to the plaintiff the $1,000, with interest thereon from May 19, 1892, and also any other legitimate damages in consequence of such fraud, less the net income of the farm during the time of the plaintiff's possession thereof; and in case such amount cannot be ascertained with reasonable certainty, then, in lieu thereof, a fair occupation rent during such possession. For the purposes mentioned the respective parties may introduce further evidence. The final judgment to be entered herein is to be made a charge on said premises until the several conditions and requirements mentioned have been fully performed by the defendants.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for further proceedings and final judgment in favor of the plaintiff and against the defendants in accordance with this opinion.