[Civ. No. 15024.  First Dist., Div. One.  June 25, 1952.]

PACIFIC ATLANTIC WINE, INC. (a Corporation), Appellant, v. GAETANO DUCCINI et al., Respondents.

Joseph L. Alioto, Marvin J. Colangelo, and Robert J. Drews for Appellant.

Elios P. Anderlini for Respondents.

WOOD (Fred B.), J.—Plaintiff has appealed from a judgment of nonsuit and from an order denying its motion for a new trial. The appeal from the order must be dismissed, for the order is nonappealable.

The appeal from the judgment involves, primarily, the sufficiency of the evidence tending to prove plaintiff's case, disregarding all evidence in conflict therewith.

In April, 1935, plaintiff as first party and defendants Gaetano Duccini and Primo E. Caredio as second parties executed a written contract concerning a certain "apparatus for the production of Vitreous and/or Metallic Surfaces," a process which defendants had invented for liquefying glass and applying it to a metal surface by means of a spray gun.

Defendants agreed, with due diligence and at their own

expense, to obtain patent rights to this apparatus and, with reasonable effort, to patent all improvements made thereon; to assign the patent rights, as soon as obtained, in exchange for shares of stock of a corporation to be formed and transfer to plaintiff 40 per cent of those shares; and to devote their best efforts to perfect and demonstrate the workability of the apparatus so as to place it on a commercial basis at the earliest possible time.

Plaintiff agreed to pay defendants $1,500 upon execution of this contract, receipt of which was acknowledged; to advance the cost of incorporation, not exceeding $250; to pay to defendants, one year from date, the further sum of $2,000 if defendants had by then organized the corporation; assigned the patent rights, transferred 40 per cent of the stock to plaintiff, and if defendants or the corporation had by then completed for other parties two satisfactory jobs by the use of this apparatus. If these conditions were not fulfilled within one year, payment of the $2,000 would be suspended until fulfillment thereof by defendants, defendants to use their best efforts to comply with all of said conditions at the earliest possible time. Plaintiff further agreed to advance not exceeding $1,000 to the corporation, to assist the corporation to undertake the manufacture of a ''Vitreous receptacle.''

The parties agreed to place the stock of the corporation under a voting trust for ten years, the trustees to be two persons named by plaintiff and two named by the defendants.

March 18, 1948, plaintiff filed this action against Duccini and Caredio, pleading the 1935 contract, alleging that plaintiff had performed all of its obligations thereunder except the advancement of the cost of the proposed incorporation; that defendants waived the incorporation and the parties agreed that no corporation would be formed and that their interest in the royalties would be 60 per cent for the defendants and 40 per cent for plaintiff; that plaintiff spent in excess of $5,000 and assigned a number of its employees to perfect and demonstrate the workability of the patent and product, and placed it on a commercial basis; that about 1940 plaintiff secured Pacific Pumice Materials Company as a licensee under the patent and as a direct result of plaintiff's activities in securing said licensee defendants had realized in excess of $40,000; that plaintiff has demanded that defendants account to plaintiff for 40 per cent of said royalties but defendants have refused to do so; and prayed for an accounting of all royalties and profits received by defendants, a money judg-

ment for the amount disclosed by the accounting as due plaintiff, and for general relief. The complaint was twice amended pursuant to orders sustaining demurrers thereto. As last amended, the complaint is substantially the same as first filed except it alleges that defendants "orally" waived incorporation and the parties "orally" agreed that no corporation be formed and that their interest in the royalties would be 60 per cent and 40 per cent respectively.

At the commencement of the trial there was discussion of the question whether the provision for incorporation was of such a nature that its nonperformance by plaintiff would entitle defendants to declare a forfeiture; also, plaintiff's counsel stated he would prove substantial performance of all the conditions of the contract except the formation of the corporation and that incorporation was impliedly rather than orally waived, a waiver implied from the acts of the parties.

Plaintiff then put on its case. When plaintiff rested, defendants moved for a nonsuit, upon the ground that the evidence failed to show any express oral agreement to waive incorporation and allocate to plaintiff 40 per cent of the royalties. Plaintiff's counsel admitted there was no evidence of an express oral executed agreement and requested permission to amend the complaint to conform to the proof, claiming he had proved facts showing that defendants waived the condition with respect to the $250 and that a corporation be formed. The court denied permission to amend, stating that such permission could not be granted without a finding that the condition for incorporation had been waived; that a prima facie case of a waiver would be insufficient for the granting of the requested amendment; and that a written agreement cannot be modified except by another written agreement or by an oral executed agreement.

Our examination of the record convinces us there was evidence of substantial performance by the plaintiff and of a waiver by the conduct of the parties, of the provision for incorporation, especially under a contract such as this which creates the relationship of joint adventurers.

Paul Aglietti, a stockholder and the secretary of the plaintiff corporation since its formation in 1934, testified that in pursuance of the April, 1935, contract plaintiff employed the defendants, paying them salaries, to develop and work on the patents, furnished them materials and equipment therefor, and rent-free space in plaintiff's winery building where the defendants carried on their work of development; that plaintiff expended $2,988.80 therefor until February, 1937, when

plaintiff ran out of funds and terminated its winery business, liquidating its personal property assets to pay off its creditors.

Duccini then took the equipment to his place, but Aglietti continued, on behalf of plaintiff, to work with the defendants in the development and commercial exploitation of the glass lining apparatus, for which a patent had been issued in October, 1936. He did this by soliciting other persons and corporations to finance the improvement and perfection of the apparatus, and by working with Duccini in the experimental work at the shop. Before the winery closed, Aglietti contacted a representative of a paint company, who investigated but did not invest. He negotiated with the Pacific Gas and Electric Company for a period of time without success. In September, 1936, a contract was executed between one Ingold and the plaintiff and the defendants for commercial exploitation of the device, a contract which expired in one year without bearing fruit. With the knowledge and cooperation of the defendants Aglietti negotiated with a number of other people, including Brown Brothers, the Lang Company of Salt Lake City, National Welding Equipment Company, Michael Ruck, the Pfaudler Company of Rochester, William E. Schlink, and Pacific Pumice Materials Company.

January 20, 1937, defendants made written demand upon plaintiff to advance the $250 for incorporation costs, failing which defendants would deem the 1935 contract at an end and plaintiff's rights thereunder terminated. Aglietti was then negotiating with National Welding Equipment Company, which resulted March 31, 1937, in a written agreement between that company and the defendants, approved by plaintiff, giving the company the exclusive right to manufacture this apparatus and the duty at its own expense to develop and improve it to commercial perfection within six months. This agreement recited that defendants owned the patent subject to plaintiff's equitable interest therein. This agreement was canceled by the parties thereto on March 28, 1938. At the trial, defendants' counsel stated that the cancellation notice of January 20, 1937, to plaintiff was waived by defendants.

Next, Aglietti negotiated with Michael Ruck. May 16, 1938, a contract was executed by defendants as first parties, plaintiff as second party, and Ruck as third party, for the development and perfection of the apparatus by Ruck, his costs to be paid by the three parties in equal shares, no charge to be made by any of them for labor or time expended for personal services

of any of them; if within six months Ruck had perfected the apparatus to a commercially successful state, the net profits of the venture would be divided upon the basis of one-third to each of the three parties; if such perfection should not be attained within six months, the contract would terminate. This contract recited that plaintiff had an equitable interest in the patent. Concurrently, defendants wrote plaintiff a letter referring to the Ruck contract and stating that if Ruck's efforts should prove unsuccessful, the relations of plaintiff and defendant relative to the patent would be and remain fixed "as per terms of contract [April, 1935] heretofore and now existing between us." Ruck's efforts proved unsuccessful and the contract with him expired.

Aglietti then negotiated with the Pfaudler Company of Rochester. Negotiations looked very favorable at the beginning. Duccini went to Rochester, with expenses paid, and demonstrated the invention. Upon his return defendants' attorney wrote plaintiff's attorney, January 24, 1939, stating the Pfaudler matter looked very favorable and suggesting that the 1935 contract between the parties be revised "to meet the present conditions." January 31, 1939, he again wrote, stating he had just received an unfavorable letter from the Pfaudler Company and indicating there was, therefore, no need to revise the 1935 contract.

In April or May, 1939, Aglietti met William E. Schlink and interested him in the invention. The negotiations extended over a period of two years. May 23, 1939, defendants gave Schlink a 30-day option to buy the invention for $250,000. The option expired and negotiations with Schlink continued. In July, 1941, defendants executed a contract with Schlink's company, Pacific Pumice Materials Company, giving the company the exclusive right to exploit the patent and to grant subleases or sublicenses for its use, the company to pay defendants a royalty of 5 per cent.

Meanwhile, defendants twice in writing demanded of plaintiff payment of the $250 for the incorporation mentioned in their 1935 contract. In the first demand, May 13, 1939, no intent to rescind was expressed. In the second demand, May 25, 1939, they said that if compliance were not made by June 20, 1939, they would consider the default a breach of the 1935 contract. Aglietti said that he was in frequent contact with the defendants and their attorney; the subject of those demands was never mentioned; that nothing was ever said about termination of the 1935 contract during the entire two-year

period of negotiations with Schlink. During the 30-day period of Schlink's option there was discussion between Aglietti and the defendants concerning modification of the 1935 contract, but modification was abandoned after the option expired.

Schlink testified that during the two-year period of his negotiations he asked Aglietti and Duccini what Aglietti's interest was and Duccini assured Schlink that the defendants had an agreement with Aglietti and that Aglietti was taken care of in the deal. Upon the occasion of the signing of the July, 1941, agreement, Schlink, observing that the proposed agreement did not provide for signature by plaintiff, asked defendants' attorney what protection Schlink would have if plaintiff or Aglietti were not a signatory, and the attorney replied that Schlink did not have anything to worry about, that they had an agreement with Mr. Caredio and Mr. Duccini and under the terms of that agreement it would not be necessary for the Pacific Wine Company to sign. Schlink then turned to Duccini and Caredio, each of whom nodded his assent. He then turned to his own attorney and asked him. His attorney replied it was all right, that Schlink had nothing to worry about, that the signatures of the defendants would be sufficient. Schlink and the defendants then signed the agreement. Aglietti corroborated this testimony of Schlink, adding that he asked plaintiff's attorney and he said it was okay. It appears that all the persons mentioned were present in the office of defendant's counsel upon that occasion.

Schlink further testified: Upon execution of the 1941 agreement we began work on perfection of the invention. Later my company assigned the agreement to me and I subsequently issued several sublicenses. It was not until 1944 that we got our first substantial job, through the Navy. Meanwhile, we employed both Duccini and Aglietti, experimenting and developing new techniques and improving the equipment necessary for the spray. I paid Duccini $50 a week for four or five years, not continuously; Aglietti (at less pay) intermittently for about three years. Aglietti testified that he was also working two hours a day for Caredio at the latter's restaurant and in 1944 had to leave for the country on account of his health. Schlink stated that after he got the job for the Navy he told Duccini he hoped Aglietti's interest was taken care of and Duccini said: That is all taken care of; you don't have to worry about that at all. Schlink also testified that whenever he referred to Aglietti or his interest he was referring to the

plaintiff because he knew they were the ones who furnished the money to proceed in this thing. The first substantial royalties became payable in May, 1945. Before that the jobs were small.

A few months after Aglietti left for the country, he returned to the shop and asked Duccini how the money was. Duccini said they had not got much and that they had a lot of expenses. Shortly after that he asked Schlink and was informed he had paid some royalties on small jobs, nothing yet on the big jobs. In 1946 Aglietti heard that substantial royalties had been paid the defendants. He inquired of Duccini and was told they only made $3,000 or $4,000 and after they paid the attorneys it would be only $1,000 or $2,000. He asked Caredio and received the same reply. He later made inquiry of officials of the Glass Spray Process Company, one of the sublicensees, and was told the defendants had been paid a big sum of money in royalties. He then went to his attorney and this lawsuit followed.

It is clear that the main purpose of the April, 1935, contract between the plaintiff and the defendants was to provide for the development of the glass spray apparatus to the point of its effective use and operation and then to exploit it commercially by manufacturing and selling it or licensing others to manufacture and sell it. That constituted the parties joint adventurers. The provision for the formation of a corporation and the apportionment of its shares between them, 40 per cent to the plaintiff and 60 per cent to the defendants, was essentially a means or device which the parties as joint adventurers deemed at the time a convenient method for pooling their interests and working together. This situation is similar to that which obtained in *Morris* v. *Whittier Amusement Co.*, 123 Cal.App. 121 [10 P.2d 1017]. It appeared from the complaint in the action that certain persons associated themselves together for the purpose of purchasing a certain theater building, agreeing to form a corporation to take title; that the corporation was formed and did take title; and that one of the associates made a secret profit in the transaction. The plaintiffs claimed that these secret profits belonged to the joint adventurers, not to the corporation. Holding that the complaint stated a cause of action the court said "The rights and liabilities of the parties who thus associate themselves for the purpose of acquiring the property and, afterward forming the corporation, are governed by the same principles as those applying to joint adventurers. [Citations.]" and that "A joint ad-

venturer who undertakes to purchase property for the joint account of himself and his associates occupies a fiduciary relation to them as respects such property. (33 C.J., p. 855.) In accordance with the principles of good faith and confidence governing the relations of joint adventurers, a co-adventurer may not conceal his interest or his profits from his associates in the enterprise. None will be allowed to obtain by secret agreement any advantage over the other.'' (P. 123.)

■ When persons execute a contract which has the legal effect of constituting them partners or joint adventurers, they acquire rights and subject themselves to duties growing out of the fiduciary relationship which they thus create. ■ Silence upon the part of one partner may constitute acceptance of an offer made to him by another partner. (*Meherin* v. *Meherin,* 93 Cal.App.2d 459, 465-466 [209 P.2d 36], and *Wood* v. *Gunther,* 89 Cal.App.2d 718, 729-731 [201 P.2d 874].) Even in the landlord-tenant relationship, a party to the lease may by acquiescence, coupled with other circumstances, waive a covenant, condition or stipulation made in his favor. (*McAulay* v. *Jones,* 110 Cal.App.2d 302 [242 P.2d 650].) There have been a number of recent decisions in which the joint adventure agreement has been distinguished from other types of agreement with significantly different legal consequences. Thus, in *Claudine* v. *West,* 109 Cal.App. 2d 726 [241 P.2d 580], the respective rights of the parties to a joint adventure contract were markedly in contrast to what those rights would have been under an owner-broker relationship. A similar contrast between the joint adventure and the stock subscription agreement was observed in *Polizzi* v. *Porcaro,* 110 Cal.App.2d 395 [242 P.2d 949]. In *Wold* v. *Luigi Consentino & Sons,* 109 Cal.App.2d 854 [241 P.2d 1032], it appeared that two licensed contracting firms entered into a joint adventure for the construction of a building but failed to procure a contractor's license for the joint adventure. It was held competent, despite the lack of a license, for one of the adventurers to bring suit against the other for an accounting and division of the profits, it appearing that the construction work had been completed and the joint adventure consummated.

A case in which the joint adventurers planned the formation of a corporation and the division of its shares among them but went ahead without organizing the corporation, is *Brown* v. *Lane Cotton Mills Co.* (C.C.A., 5th Circ.), 28 F.2d 911. Brown purchased certain property and then entered into a

contract with W. E. Floding and Mary Floding for the opera-
tion of the property by a corporation to be organized, 600
shares of the capital stock to be divided in stated amounts
between Brown, the Flodings, and one James J. Keily, after
payment of a debt of Brown's to Lane Cotton Mills. The
business was carried on but the corporation was not formed.
Later the property was sold under a judgment in favor of
Lane Cotton Mills, bringing more than enough to satisfy the
judgment and to pay indebtedness incurred in the operation
of the property. The surplus was ordered distributed to the
individuals mentioned, in the same proportion as provided in
the contract for the division among them of the shares of
the proposed corporation. The reviewing court approved this
disposition of the surplus, applying the principle that equity
regards that as done which should have been done.

■ In the light of these principles it is clear that the
trier of the facts could reasonably infer from the evidence
adduced upon the trial of the present action that the parties
by their conduct had waived the use of a corporation as a
means for the conduct of their joint adventure; that the
plaintiff and the defendants are respectively entitled to a due
proportion of the five per cent royalties accrued and accruing
under the licensing agreement with Schlink; and that their
respective shares should be measured upon the basis of 60 per
cent to defendants and 40 per cent to plaintiff as provided in
their joint adventure agreement for the division between them
of the capital stock of the proposed corporation. We are
not undertaking to say that those are the only inferences
which might be drawn. That is the function of the trier of
facts. But the legal possibility of the drawing of such in-
ferences by the trier of the facts rendered a nonsuit improper
and requires a reversal of the order of nonsuit.

Yet, the defendants insist in support of the nonsuit, that
there was a fatal variance between pleading and proof; the
pleading of an oral waiver and the proof of waiver or of
mutual acquiescence, by conduct. Such a contention is highly
technical in character, especially in view of the fact that
defendants could not have been taken by surprise in preparing
for trial or in trying the case. Their demurrers to the com-
plaint and the amended complaints indicate they clearly had
this point in mind, and plaintiff's counsel at the very beginning
of the trial announced that he expected to prove a waiver
implied from the conduct of the parties. Plaintiff then put
on its case and this issue and the facts bearing upon it were

fully developed during the examination and cross-examination of plaintiff's witnesses. ▇ "A variance between the allegations of a pleading and the proof will not be deemed material unless it has actually misled the adverse party to his prejudice in maintaining his action or defense on the merits, and a variance may be disregarded where the action has been as fully and fairly tried on the merits as though the variance had not existed. [Citations.]" (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 382 [240 P.2d 580].) ▇ The trial court should have granted plaintiff's request for permission to amend to conform to the proof (see *Miller* v. *Republic Grocery, Inc.*, 110 Cal.App.2d 187, 193-194 [242 P.2d 396], and *McKee* v. *Mires*, 110 Cal.App.2d 517, 523 [242 P.2d 954]), where, as here, the asserted defect of pleading was remediable (see *Lawless* v. *Calaway*, 24 Cal.2d 81, 92-94 [147 P.2d 604]).

▇ Defendants raise a question concerning the capacity of plaintiff to sue. Formed in 1934, the plaintiff corporation discontinued and liquidated its winery business in 1937, paying all of its creditors in full. It has not been dissolved, nor has it gone through bankruptcy. It presently has 18 or 20 stockholders. There is evidence that from 1940 to 1950 it was suspended on the records of the Secretary of State for failure to pay the minimum franchise tax. In 1950, the back taxes were paid for a revivor of the corporation. Upon the advice of its attorney and for the purpose of continuing this action, plaintiff paid those taxes prior to the trial in the court below. Defendants' contention that plaintiff's revivor was ineffectual to enable it to proceed in this action is fully answered by the decision in *Hall* v. *Citizens Nat. Tr. & Sav. Bank*, 53 Cal.App.2d 625, 630-632 [128 P.2d 545]. No significant change was made in the applicable provisions of the statute after the corporate revivor in the Hall case (1940) and before the revivor effected in the instant case (1950). Those provisions appeared in sections 32 and 33 of the Bank and Corporation Franchise Tax Act.*

The judgment is reversed and the appeal from the order denying a new trial is dismissed.

Peters, P. J., and Bray, J., concurred.

*Section 32 was amended by Stats. 1939, ch. 1050, p. 2934 at p. 2971, and by Stats. 1943, ch. 352, p. 1403 at p. 1463. Section 33 was last amended by Stats. 1937, ch. 836, p. 2324, at p. 2348. The provisions of those sections were transferred to the Revenue and Taxation Code, as sections 23301-23305a, by Stats. 1949, ch. 557, p. 961 at pp. 970-972, to take effect July 1, 1951, as provided in section 4 of that chapter, p. 1045.