[Civ. No. 21559. Second Dist., Div. Two. Dec. 31, 1956.]

C. H. STEVENS, Appellant, v. VINCENT A. MARCO et al., Respondents.

J. Robert Maddox for Appellant.

John P. McGinley, Robert N. Gold, Loeb & Loeb and Herman F. Selvin for Respondents.

FOX, J.—Plaintiff appeals from a judgment of nonsuit in an action in which he sought damages for breach of contract, fraud, money had and received and goods sold and delivered. Under familiar rules of appellate procedure in considering the propriety of a nonsuit, we must resolve every evidentiary conflict in plaintiff's favor, accept as true all evidence adduced, direct or indirect, supportive of plaintiff's case and indulge in every legitimate inference which may be drawn from such evidence for plaintiff's benefit. (*Aguirre* v. *City of Los Angeles*, 46 Cal.2d 841, 844 [299 P.2d 862]; *Singer* v. *Marx*, 144 Cal.App.2d 637, 640 [301 P.2d 440].) In our statement of the record, the court assumes as established all evidence, and every proper intendment therefrom, favorable to plaintiff's causes of action.

In 1942, plaintiff was employed by Consolidated-Vultee Aircraft in San Diego, California, as an electrical engineer. He had never finished high school and was self-educated in his profession. In the middle of 1942, plaintiff's work was devoted to the design of the electrical system installed in military aircraft. While so engaged, the idea occurred to him that various lights used in aircraft to indicate whether or not particular aeronautical equipment was functioning might

give a false impression because of a burned out bulb. He conceived a device, which would be part of the indicator light assembly, by which the pilot could test the bulb and quickly determine whether it was defective.

Plaintiff had no experience with patents or patent applications but he was interested in having this device patented and commercially exploited. Plaintiff made a sketch of such a device and, through a friend named Wilford, was introduced to defendant Marco. He was told Marco had the facilities to develop and market the device. Marco was an attorney and an officer, stockholder and sales manager of the Searl Aero Industries, a corporation capable of manufacturing the indicator-light device in quantity. Marco told plaintiff that if Searl were given the sales and production rights he would obtain the necessary patent protection at no cost to plaintiff.

On July 15, 1942, the parties executed a written contract under which Marco agreed to proceed diligently with the engineering development of the light and to secure at his own expense and in his own name the necessary patent protection. Plaintiff agreed to assign to Marco all right, title and interest in the light as well as the exclusive right to patent, manufacture and sell the light in exchange for a three per cent interest in any patent, or, at plaintiff's election, in return for payment of 3 per cent of the net sales price of all lights sold. Upon signing of this agreement, plaintiff assigned his interest in the light to Marco.

On February 13, 1943, the contract was modified in certain respects. The new contract recited (1) that patent applications had been filed in Marco's name; (2) that Marco would assign a 3 per cent interest in the patent to plaintiff upon its issuance; (3) that Searl had been given an exclusive contract to manufacture the light and was authorized to pay plaintiff 3 per cent of the net sales price. Plaintiff expressly warranted in the contract that Consolidated had no property rights in the light and agreed that if others claimed rights in the patent or an infringement, payment to him might be suspended until settlement of the dispute. On February 18, 1943, Marco filed an application for a patent on what was termed a "tell-tale and testing light."

In March, 1943, a question arose as to whether Consolidated had some interest in the light because of an invention agreement which plaintiff had previously signed with Consolidated. Marco went to San Diego to discuss the matter with an official of Consolidated and subsequently engaged in negotia-

tions with Consolidated regarding the matter. On April 24, 1943, Consolidated sent Marco a waiver of "all right in and to the indicator light invented by C. H. Stevens."

Thereafter, Searl proceeded with the development of the light. Plaintiff actively assisted in the process of preparing a prototype and checked the reactions of pilots to the light in test flights. In June, 1943, Searl commenced production of the light. Certain companies, including one called Dial Light, were given sales licenses. In August, 1943, plaintiff received his first royalty check, and subsequent payments were remitted to him monthly.

On October 12, 1943, Marco filed a second application for a patent for what he described as a "signal light." In his statement accompanying the application, Marco described the invention as "of a generally similar nature to that constituting . . . my copending application . . . upon which the present device constitutes an improvement." Marco never showed plaintiff either of the patent applications filed in his name. For convenience, these applications will be subsequently denominated Marco 1 and Marco 2, respectively.

In 1944, plaintiff informed Marco that he would like a new contract to be drawn. Marco acquiesced. Plaintiff employed an experienced patent attorney named Curtis to prepare the agreement. It was signed on March 9, 1944. So far as material, it recited that Marco was the inventor of the indicator light devices which were the subject of the two patent applications, that he owned an interest in, and controlled the business of Searl, a licensee of the invention, and that plaintiff had contributed valuable engineering services in their development which entitled him to compensation. It was therefore agreed that Marco would use his best business judgment and diligence in developing and selling the device and would pay plaintiff, on the fifteenth of each month, 3 per cent of 95 per cent of the gross selling price of the lights, including devices embodying this invention or improvements. The improvements would include all inventions by Marco or Searl during the life of the agreement, which was stated to be for the terms of the patents, if granted, or, if disallowed, for 10 years thereafter. Plaintiff agreed to assign to Marco any improvements he might make on the light. Marco agreed to keep books of account showing sales which would be accessible to plaintiff.

After the execution of this agreement, an engineer named Fred Aves, who was employed by Searl, perfected a device

known as a "light shutter and dimmer," a unit which could be attached to and used in combination with the signal lights on which Marco had made patent application. The device was assigned to Marco. On June 7, 1944, Aves applied for a patent on this shutter. Plaintiff testified he had no knowledge either of the Aves patent application or its ultimate issuance until 1953.

With the passage of time, the volume of sales increased beyond Searl's capacity to meet the demand. Thereupon Marco licensed Dial Light Company to manufacture and sell the light in the territory east of the Mississippi River and limited Searl's area of operations to the western part of the United States. Plaintiff was advised of this arrangement. Although he continued to receive royalties from Searl, plaintiff failed to obtain royalties from the Dial Light operation. He complained of this in a series of letters to Marco in the spring of 1945.

Plaintiff did a great deal of work in propagating acceptance and sale of the light. At Marco's request, plaintiff was successful in obtaining approval of the light by the Air Force, enabling it to be used on military planes and increasing its sales potential. Marco supplied plaintiff with an entertainment expense account, sample lights, and advertising material, and plaintiff went on sales tours for the purpose of soliciting orders for the light. He made one complete sweep of the aircraft industry on both the east and west coast pushing the sales of the indicator light.

On June 13, 1945, Marco wrote a letter to Stevens regarding the Dial royalties. The concluding part of this letter reads, in part as follows: "Another matter of great importance is that our patent attorneys have reported that conflicting patents exist between our panel light patents and a patent obtained and filed on January 25, 1938, and granted on March 5, 1940, Number 2192345. This patent has been assigned to one of the large light companies in 1940, who retained the property rights of the same. It might be that you have some views on this matter as no doubt this conflict will end in litigation very soon."

It will be recalled that prior to the time this letter was written Marco had filed three patent applications, two in his own name and the third in the name of Aves, although he was assignee thereof. Marco was represented by patent attorneys in Washington, D. C., one of whom was named Crammond. As the claims made for the various devices were

processed through the Patent Offices, the patent examiners cited to Marco's attorneys various earlier patents relating to the subject matter of the applications either as examples of prior art or as possibly constituting a block with respect to approval of all the claims advanced. In addition, the Patent Office indicated that there was a misjoinder in Marco 1 and Marco 2 of unrelated inventions and required a separation between the claims relating to a pilot lamp system and those relating to the shutter. Various amendments to the claims were made by Marco's attorneys in their efforts to meet objections of the Patent Office and its rejection of particular claims.

With respect to the patent situation and the existence of the conflict referred to in Marco's letter of June 13, 1945, the record shows the patent alluded to in that letter was one issued to a certain Foute.[1] Sometime in June, 1945, Marco received from his patent attorney Crammond, a copy of a patent examiner's report on the Aves application. That report cited six patents as bearing on the Aves application, including the Foute patent. Marco testified he telephoned Crammond and discussed a possible conflict with the Foute patent. He testified that Crammond's view was that a conflict was "something that could be important, and that thing, that importance would not be determined until after the patent had been completely processed. . . ." Thereafter, Marco procured a copy of the Foute patent and discussed it with various persons, including Aves. Aves took little stock in the possibility that the Foute patent would be a block. In a letter written to the Commissioner of Patents on July 18, 1945, about five weeks after Marco wrote Stevens of the Foute conflict, Crammond stated this view: "The Foute patent . . . does not appear to be particularly related to the devices of the claims. It relates merely to the method of mounting a base or socket on a tube."

We return to the sequence of events following plaintiff's receipt of the letter of June 13, 1945. Plaintiff did not reply to this letter. He testified that as a result of this letter a serious question arose in his mind as to whether the light was actually his invention rather than one which had

---

[1]The Foute patent had been assigned to the Drake Mfg. Company, manufacturers of panel lights. Marco testified he believed when he wrote to Stevens on June 13 that the Drake Company would protect its rights and that there would be litigation because of the Foute "conflict." At no time did Drake advise Marco of any infringement on the Foute patent nor did they ever initiate litigation of this nature.

been the subject of a prior patent. He feared also that a large light company would bring legal action against him. However, when he received a royalty check from Searl in July, he began to feel the situation was not as serious as he had imagined. Therefore, through his attorney Curtis, he wrote Marco on July 18, 1945, requesting an accounting of the Dial Company royalties, which he had not received.

As matters developed, however, despite the fact that Searl continued to manufacture and sell lights, plaintiff failed to receive royalties from Searl either in August or September. Instead, in the latter part of September, Marco served him with a written notice of rescission dated August 31, 1945. After first reciting the contractual arrangements between the parties, the document, signed by Marco, states:

"WHEREAS, notice has been given to the undersigned, VINCENT ANTHONY MARCO, of an existing conflicting patent obtained and filed on January 25, 1938, granted March 5, 1940, Patent No. 2,192,345, embodying the basic claims and principles of the Indicator Light, the sole rights to which were assigned by you to the undersigned, and upon which you, C. H. STEVENS, made warranty that no other person or Company had a property right in and to said device:

"Now, THEREFORE, you, C. H. STEVENS, are hereby notified that the undersigned, VINCENT ANTHONY MARCO, hereby renounces, repudiates and terminates any and all agreements heretofore entered into by and between you and the undersigned, and particularly the agreements of July 15, 1942, February 13, 1943, March 1, 1943, and March 9, 1944; that the undersigned hereby abandons any position as assignee, licensee, or patentee under any of the agreements aforementioned; that the undersigned renounces any and all protection, if any, of any assignments or licenses given by you to the undersigned; that the undersigned hereby refuses to make any further payments as royalties or payments on patent interests or interests in net sales as included in said agreements aforesaid.

"You are further notified that the undersigned, VINCENT ANTHONY MARCO, gives you this notice for the reason that it now appears that you had no authority to assign to the undersigned any right, title or interest in and to the Indicator Light covered by the agreements by you mentioned; that you had no right to license the exclusive manufacture and sale thereof; that the warranties expressly stated and made by you in the agreement of February 13, 1943, and impliedly

stated in all other agreements entered into by and between you and the undersigned have been breached; that the assignments and licenses heretofore made by you to the undersigned are invalid and void, and that the consideration for any and all agreements made between you and the undersigned concerning the exclusive manufacture and sale of the said Indicator Light has failed.

"You are further notified that the undersigned no longer recognizes the binding force of any agreement between you and the undersigned concerning the manufacture and sale of said Indicator Light, and will hereafter conduct himself in hostility to and in defiance of all agreements heretofore entered into between you and the undersigned, and that the undersigned declares that he is freed and discharged from any liability or obligation of making any further payments hereafter as royalty, patent interest, or interest in net sales under any of the agreements aforementioned."

Plaintiff testified this letter induced in him the belief that he had sold Marco "a bill of goods," that his idea infringed a prior patent, that no patent would therefore be obtainable since his idea was not original. Believing he would be sued, plaintiff recorded a declaration of homestead.

On October 11, 1945, plaintiff and his attorney Curtis met in San Diego with Marco and his lawyer for a conference on the matter of the Dial royalties. Marco informed plaintiff that the Army and Navy had stopped payment of the Dial royalties and that he would be paid when the funds were released. The discussion then turned to the patent conflict. Marco had a copy of the Foute patent and stated "that he was unable to perform under the contract, he couldn't make them [the lights] if there was an infringing patent." Marco offered to let Curtis examine the patent but the latter refused, stating that the meeting was called solely to discuss the Dial royalties, and that Marco would have to perform regardless of a patent conflict. The interview became stormy and Curtis advised plaintiff to sue Marco. Plaintiff testified he did not accept Curtis' statement that he had a cause of action against Marco because he did not believe Marco could perform under the contract. He also relied on Marco's statement that he would be paid the Dial royalties upon their release.

After the meeting of October 11, 1945, the parties had no further contact until June 26, 1946. Plaintiff had been apprised that the impounded Dial royalties were released and on that day he came to Marco's office to collect his share.

He was accompanied by his employer, Ralph Wilford. At this meeting plaintiff was paid the sum of $2,764.99 by Marco. Thereupon, plaintiff executed an accord and satisfaction. At the same time plaintiff signed a printed form entitled "Release of All Demands" the effect of which was to release and discharge Marco from every character of obligation due plaintiff. Plaintiff offered evidence of what was said at this meeting for the purpose of showing fraudulent misrepresentations made by Marco at the time these instruments were executed. This evidence was excluded on the ground that plaintiff's complaint did not plead the making of, or his reliance on, any fraudulent representations subsequent to August 31, 1945.

Plaintiff testified that at the time he signed the release and accord and satisfaction and thereafter until 1953, he reposed trust in Marco and entertained the belief that there was an existing patent in conflict with his idea for an indicator light, that he would probably be sued by the large company that owned the conflicting patent and that by signing the release he would be free from any litigation as a result of having sold Marco "a no good idea." Plaintiff testified that Marco had represented at the meeting of October 11, 1945, that if there was an infringement he could no longer manufacture lights and when that meeting broke up plaintiff stated he felt Marco could no longer perform under the agreement.

Marco had continued during this time to prosecute all three patent applications, which were finally granted in 1947. Warren Jessup, a patent attorney, testifying as an expert, examined the official file wrapper containing all action taken with respect to the above applications. He stated that with respect to Marco 1, the file showed that by February 14, 1946, the patent examiner indicated he would allow some of the claims. Indication of allowance of claims by the patent examiner in Marco 2 appeared as early as February 20, 1946. Marco 1 was passed for issue of a patent on October 30, 1946. Marco 2 was passed for issue on June 16, 1947, while the Aves' application was passed for issue on December 6, 1946. However, at Marco's request, issuance of the patents was deferred until July 29, 1947, at which date all three patents were simultaneously issued.

In Jessup's opinion, the Foute patent was not in conflict with either of the Marco applications, nor with the Aves

application. Jessup testified that the contents of a patent application are secret and not a matter of public record. After it has issued the patent is available to the public.

Marco testified that although he believed there was a conflict between the Foute patent and the Aves application on June 13, 1945, that was not his belief one year later, when plaintiff signed the release, because that matter had been resolved in the meantime. He also testified that he never believed there was a conflict between Marco 1 or Marco 2 and the Foute patent as to the individual elements, exclusive of the head, set forth in those applications. By the time plaintiff signed the release Marco knew there was no longer any danger of infringement litigation.

In 1947, defendant Marco Industries Company was formed by Marco, who was then its president and sole stockholder. In December of that year, a license agreement between Marco and the corporation was executed, by which Marco assigned the three patents to the corporation and gave it the right to manufacture and sell the indicator light west of the Mississippi. Marco's royalty was originally 10 per cent of the sales, but subsequently a new agreement was made by which Marco transferred the patents to the company for the sum of $300,000, payable in installments until 1963. At the time this action was tried, the gross sales of the lights amounted to over $4,000,000.

By the end of 1945, plaintiff had dissociated himself from the aircraft industry. From October, 1945, to 1948, he worked in a wholesale appliance business in San Diego. After a short interlude as a salesman, plaintiff became special agent for an insurance company in San Diego and continued in that occupation until he filed his complaint. From the time he signed the accord and release, plaintiff had no further contact with Marco until about 1953. During the intervening years he testified he had no information that any patents were granted or that Marco, Searl, Dial or any other defendant was manufacturing the indicator lights nor did he have knowledge of circumstances that would rouse his curiosity. He made no inquiries during this period about the Foute patent.

In February, 1953, plaintiff attended a public display of aircraft equipment in San Diego. In examining the folders and catalogues at the exhibit, he read about indicator lights being produced by the Marco Industries Company under three patent numbers. The accompanying statement asserted: "Over 3,000,000 lights manufactured." That was the first

time plaintiff became aware that patents had been granted. Two weeks later, he obtained copies of the three patents mentioned in the folder and the Foute patent. He then engaged patent attorneys to compare the patents. He was advised that they didn't see any conflict between the patents. On August 25, 1953, plaintiff served upon defendants a notice of rescission of the release and the accord. This action was filed on October 2, 1953.

The original action was framed in six counts. At the outset of the trial plaintiff elected not to proceed on count one (to enforce a rescission of the accord and the release) and count three (for declaratory relief).

Count two was an action at law for damages for breach of the agreements between plaintiff and Marco.

Count four was an action for damages based on fraud in inducing plaintiff to believe the lights could no longer be manufactured or sold, thereby inducing him to execute the release and accord. The misrepresentations alleged were (1) the portion of Marco's letter of June 13, 1945, previously quoted, and (2) the notice of August 31, 1945, in which Marco wrote plaintiff "That there was an existing, conflicting patent obtained and filed on January 25, 1938, granted March 5, 1940, Patent Number 2,192,345 (hereinafter referred to [as] Foute Patent) embodying the basic claims and principles of said indicator light embodying a bulb-testing device, and that as a consequence thereof the said Vincent A. Marco renounced, repudiated and terminated any and all agreements."

Counts five and six were for money had and received and for goods sold and delivered, respectively.

To this pleading defendants responded with an answer which, in addition to denials, interposed the affirmative defense of limitations (Code Civ. Proc., §§ 338, subd. 4 and 337, subd. 1, laches, compromise, accord and satisfaction and release.

At the close of plaintiff's case, judgment was entered in favor of Mrs. Marco with plaintiff's acquiescence. Marco moved for a nonsuit based on (1) insufficiency of the evidence; (2) the bar of the statute of limitations, 338, subdivision 4; (3) plaintiff's knowledge of the facts allegedly constituting false representations; (4) lack of a confidential relationship; (5) plaintiff's inexcusable failure to investigate the facts presented to him; (6) no evidence of concealed fraud or fiduciary relationship. (Laches was withdrawn.) A motion for

nonsuit in behalf of Marco Industries was also made on all above grounds, including lack of privity of contract.

Both motions were granted without limitation as to the ground.

Defendant's argument in support of the order of nonsuit is essentially structured on the following propositions: (1) that the release and the accord conclusively barred any cause of action on the contracts; (2) that plaintiff failed as a matter of law to establish actionable fraud; and (3) that any relief, based on the alleged fraud, was barred by the statute of limitations. As these contentions are developed in the briefs with commendable vigor and exhaustive reference to the authorities, it is manifest that defendants honor more in the breach than in the observance the principles binding on an appellate court in reviewing a nonsuit. It is axiomatic that those principles require us to give plaintiff's evidence all the value to which it is legally entitled and to consider every inference which can reasonably be drawn tending to sustain plaintiff's case. It is from this perspective that we have stated the controlling facts and it is with this orientation that they must be evaluated. Measured by this standard, it is not to be doubted that there was substantial evidence favorable to plaintiff on the issue of fraud and misrepresentation, and that it was error to grant a nonsuit.

One of the fundamental fallacies underlying defendant's position is the assumption that there was no confidential relationship between plaintiff and Marco, so that the presumptions and special rules of law which govern when that relationship exists are not here applicable. The facts and the law utterly belie this. ■ "Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another." (*Estate of Cover*, 188 Cal. 133, 143 [204 P. 583].) ■ When the parties are so circumstanced or associated in a business transaction that one party must rely on the good faith and integrity of the other, the fiduciary character of the relationship may exist despite the absence of a blood relationship. (*Cox* v. *Schnerr*, 172 Cal. 371, 378 [156 P. 509]; *Bank of America* v. *Sanchez*, 3 Cal.App.2d 238, 243 [38 P.2d 787]; *Adams* v. *Talbott*, 61 Cal.App.2d 315, 320 [142 P.2d 775].) Plaintiff testified he trusted Marco implicitly and had confidence in his promises and representations. The record shows that plaintiff was the inventor of a novel device, as to which he had an inchoate privilege to apply

for a patent. (*Golden State & Miners' Iron Works* v. *Angell*, 89 Cal. 643 [27 P. 65]; *Hendrie* v. *Sayles*, 98 U.S. 546 [25 L.Ed. 176]; 35 U.S.C.A. § 33.) With the economic exploitation of his invention in mind, he disclosed this secret to Marco, who promised that if plaintiff transferred his interest therein to him, he would proceed to prosecute an application for a patent, manufacture and sell the device, and pay plaintiff a royalty on gross sales. It was further agreed in the contract of March 9, 1944, that plaintiff's royalties were to extend also to the sale of devices which embodied any improvements Marco might make or acquire, while plaintiff agreed to assign to Marco any improvements he might make.

■ Where an inventor entrusts his secret idea or device to another under an arrangement whereby the other party agrees to develop, patent and commercially exploit the idea in return for royalties to be paid the inventor, there arises a confidential or fiduciary relationship between the parties. (See *Hollywood M.P. Equipment Co.* v. *Furer*, 16 Cal.2d 184, 188-189 [105 P.2d 299]; *Schaake* v. *Eagle etc. Can Co.*, 135 Cal. 472, 485 [63 P. 1025, 67 P. 759]; *O'Hara* v. *Harman* 14 App.Div. 167 [43 N.Y.S. 556, 558]; *Reynolds* v. *Saco-Lowell Shops*, 54 F.Supp. 109, 114.) Indeed, it would be difficult to postulate a relationship more confidential than one in which a secret is imparted to a person professing to have the ability and facilities to develop, patent, and exploit it upon his promise to give the inventor a return in the form of royalties. . ■ In the instant case, the salutary character of such a rule is manifest. Plaintiff transferred to Marco a new and valuable idea and Marco assumed full responsibility for securing a patent. Since the processing of a patent application is secret, plaintiff could learn only what Marco cared to divulge about the progress of the Marco applications, as well as other applications on improvements, and he had of necessity, because of Marco's superior position in this respect, to repose a special confidence in Marco's integrity. In addition, since Marco was in charge of the marketing of the device, plaintiff had also to rely on his business judgment with respect to production, and on his fidelity with respect to keeping and furnishing honest accountings of sales. Here, too, Marco occupied a superior position. There was present, therefore, all the classic elements of a confidential relation, and Marco owed to plaintiff the fiduciary obligations of utmost good faith and fair dealing of one occupying a status akin

to that of a trustee. As stated in *Cox* v. *Schnerr, supra,* 172 Cal. 371, 378, ''And this rule [of fiduciary obligation] does not apply merely to those who bear a formal relation of trust to those with whom they deal—not only to attorneys, physicians, trustees, clergymen, kinsmen, *and others who by the very force of their occupations or relationship are presumed to be in the class of persons bound to act with the utmost good faith. It applies in every case where there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding.''* (Italics added.) Of like effect is *Bradley Co.* v. *Bradley,* 37 Cal.App. 263, 267 [173 P. 1011]. The instant case is patently within the scope of such rule.

Furthermore, the jury might also have found, as a matter of fact, that the parties were allied in an enterprise similar to that of joint venturers for mutual gain. ▮ The royalty agreements between the parties are not, as defendants contend, merely ''a contract of assignment and sale.'' The last agreement of the parties, executed on April 9, 1944, plainly indicates that Marco was to exploit and develop the use of the patents for their joint profit and that any subsequent improvements made by either would accrue to their mutual benefit. At Marco's request, plaintiff traveled all over the country and engaged in extensive publicity, sales and demonstrational work in behalf of the light. Bearing these factors in mind, the case of *Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751 [128 P.2d 665], while not in all respects similar, is most didactic. In that case, defendant developed a particular machine which was still in an experimental stage. Defendant sold this machine to plaintiff, who was under no obligation to pay if the machine did not function adequately. The contract also provided that in consideration of the purchase of the machine and demonstration of its advantages by plaintiff, defendant agreed to pay plaintiff 20 per cent of the gross selling price it received from further sales of the machine. Plaintiff agreed to foster the sale of the manufactured machine. Defendant also agreed to endeavor to patent the machine and agreed that plaintiff would have a 20 per cent interest in such patent—and in any improvements thereon that might be thereafter made by either party. Plaintiff was to bear 20 per cent of the cost of prosecuting the patents. Thereafter, plaintiff assisted in creating a market for this machine. In construing the contract to ascertain the relationship of the parties, the trial court found,

among other things, that the contract was a mutual agreement of the parties to work together and pool their inventive ideas in an endeavor to perfect the machine. The Supreme Court commented as follows on this question: "In other words, the defendant, having the facilities for the manufacture of machinery, desired the benefit to be derived in experimentation with the press incident to continuous milling operations and the plaintiff undertook to contribute to the venture practical demonstration of the mechanism under the direction of experienced employees, and to do advertising and promotion work for the purpose of creating a market for an efficient pellet-producing machine. This cooperation promotive of the common enterprise and involving the combination of the skill and efforts of both the plaintiff and the defendant suggests that the parties intended to establish a contractual relationship between themselves akin to that of joint adventurers. Further indication of this purpose is the royalty clause of the agreement referable to the plaintiff's share of the gross proceeds of sales of presses *based upon* the original model, *whether such sales be negotiated by the plaintiff or the defendant,* and the clause relating to the respective interests of the parties in any patent of the machine and '*any improvements thereon that may be thereafter made by either party.*' While in a technical joint venture there is usually a sharing of profits and losses in the prosecution of the common enterprise [citation], the mode of participating in the fruits of the undertaking may be left to the agreement of the parties. [Citation.] Whether the parties to a particular contract have thereby created, as between themselves, the strict relation of joint adventurers or some other relation involving cooperative effort, depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts."

 ▮ In the instant case, since plaintiff and Marco agreed that each would provide the other with the benefits of any improvements, since plaintiff's royalties were based not only on his original idea but on sales of the device embodying improvements made by either party, since plaintiff participated actively and energetically in the venture by sales and promotional work and contributed generously of his time and his contacts to further the acceptance of the light in civilian and military aircraft circles, there was substantial evidence on which the jury might find a cooperative under-

taking of the parties founded on a fiduciary relationship. In *Pacific Atlantic Wine, Inc.* v. *Duccini*, 111 Cal.App.2d 957, 964 [245 P.2d 622], it is stated: "It is clear that the main purpose of the April, 1935, contract between the plaintiff and the defendants was to provide for the development of the glass spray apparatus to the point of its effective use and operation and then to exploit it commercially by manufacturing and selling it or licensing others to manufacture and sell it. That constituted the parties joint adventurers." It is not necessary to precisely define the relationship thus created as one of joint venture in order to hold it to have created a fiduciary relationship. This is clearly pointed out in *Nelson* v. *Abraham*, 29 Cal.2d 745 [177 P.2d 931], where the court stated, at page 750: "It is, however, unnecessary to place a precise legal designation on the relationship between the parties. The present controversy is between the parties to a contract by which the plaintiff admittedly became entitled to a one-third share of the net profits from operation without acquiring an interest in the business. The oral agreement and the conduct of the parties thereunder, considering the nature of the undertaking and the surrounding circumstances, define their respective rights, liabilities and duties one to the other without the necessity for designating their relationship by a particular label." At page 751, the court further remarked: "The one who is entrusted with the rights of another is charged with the duty of guarding those rights with the utmost good faith."

Further discussion would only be a belaboring of the obvious fact that there was a substantial evidentiary basis for finding that the relationship between plaintiff and Marco was a confidential and fiduciary one. As stated in *Sime* v. *Malouf*, 95 Cal.App.2d 82, 95 [212 P.2d 946, 213 P.2d 788], "Defendants quite understandably endeavor to escape the responsibilities of fiduciaries rather than to justify their conduct." Marco cannot, in this case, be held to a less exacting standard than that of a fiduciary. ▌ Nor can he take advantage of his fraud, the existence of which will be subsequently developed, to disclaim the continuation of a fiduciary relationship following his assumption of a hostile attitude toward plaintiff. "The fact that persons engaged in a joint venture may quarrel or be at odds over the business in which they are associated or may even be involved in litigation with one another, does not as a matter of law relieve them of their fiduciary duties [citations] . . . . The successful consumma-

tion of a fraud would be a relatively simple matter if the mere negation of the agreement, or the provocation of strained relations, were sufficient to exempt one joint adventurer from his duty of highest good faith to his associates [pp. 97-98].'' (*Sime* v. *Malouf, supra.*) Here, Marco was at all times the custodian of plaintiff's secret invention; he continued to prosecute the patent applications; and at all times he continued to manufacture, sell and profit from the device plaintiff had conceived. It was his bounden duty, therefore, to act with the integrity and probity of a fiduciary during such time in relation to plaintiff.

Against this background we turn now to a consideration of the evidence bearing on the question of Marco's fraud, overreaching and abuse of confidence in the transactions between the parties.

In his letters to plaintiff, Marco represented that it had been reported to him that a ''conflicting patent exists between our panel light patent'' and the Foute patent and that this conflicting patent embodied ''the basic claims and principles of said indicator light embodying a bulb testing device.'' However, as the record shows, the Foute patent was not cited in connection with Marco 1 or Marco 2, which embodied plaintiff's basic idea, but solely in connection with the Aves application, of which plaintiff testified he had no knowledge. Marco had seen the patent examiner's report citing Foute in connection only with the Aves application. The record is barren of any evidence suggestive of a conflict between Foute and Marco 1 or 2, the only applications of which plaintiff was aware, and according to which design many of the lights were being manufactured. Knowing his information related only to the Aves application, Marco failed to disclose this fact to plaintiff. His statements to plaintiff that Foute conflicted with ''our panel lights'' and that it conflicted with plaintiff's idea of an indicator light embodying a bulb testing device were clearly false representations. In *Gillespie* v. *Ormsby,* 126 Cal.App.2d 513, 527 [272 P.2d 949], this court stated that ''in dealing with the question of false representations, . . . one who speaks is not only obligated to tell the truth but he is equally bound not to suppress or conceal any facts within his knowledge which materially qualify those stated [citations].'' Having suppressed the fact that the only possible conflict was between Foute and Aves, Marco created the impression that plaintiff's idea was

not patentable, and that further manufacture of the lights in the face of such conflict would be an infringement. Having superior, if not exclusive, knowledge of all the facts, Marco was bound to disclose them in their entirety so that plaintiff would fully and accurately understand the actual state of affairs. Where a relation of trust and confidence exists demanding that information communicated respecting the subject of dealings between parties be full and complete, any concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action. (*Kruse* v. *Miller*, 143 Cal.App.2d 656, 659-660 [300 P.2d 855]; *Sime* v. *Malouf, supra*, 95 Cal.App.2d 82, 101; *Vance* v. *Supreme Lodge of F.B.*, 15 Cal.App. 178, 182-183 [114 P. 83].) Section 1710, subdivision 3 of the Civil Code is a statutory expression of this principle.

Marco argues that since the Aves shutter was an "improvement" it was a part of the indicator light within the meaning of the contract between the parties. We need not concern ourselves with whether or not this is technically correct under the law of patents. What is here crucial is the fact that Marco deliberately created the impression, by suppressing the fact that it was only in relation to Aves' so-called improvement that the Foute patent was cited, that plaintiff's basic idea for an indicator light was not patentable. This especially appears from the letter of August 31, 1945, referring to a conflict between Foute and plaintiff's idea of a device embodying a bulb testing device. From the record the jury could find that Marco never honestly entertained the belief that Foute conflicted with plaintiff's basic idea, a finding that would be buttressed by the fact that he never interrupted his manufacture of the light embodying plaintiff's invention.

Because of the confidential relationship between them and since plaintiff had never seen the contents of Marco's patent applications (which were exempt from public scrutiny) plaintiff was entitled to rely on Marco's tendentious representations regarding a conflict. "Even when contracting parties are adverse to each other, either has the right to rely upon an express statement made by the other of an existing fact of which the truth is known to the other and unknown to him." (*Calmon* v. *Sarraille*, 142 Cal. 638, 642 [76 P. 486].)

 Furthermore, where one is justified in relying, and does in fact rely, upon false representations, his right of action is not destroyed merely because opportunities for examination or means of knowledge were open to him where no legal

duty devolved upon him to employ such means of knowledge. (*Teague* v. *Hall*, 171 Cal. 668, 671 [154 P. 851]; *Blackman* v. *Howes*, 82 Cal.App.2d 275, 279 [185 P.2d 1019, 174 A.L.R. 1004].) It is noteworthy that Jessup testified that as an expert in patent law he could not tell whether the Foute patent conflicted with Marco's patent application without having before him copies of both the patent and the applications. In 1945 and 1946, plaintiff never was shown the latter and they were unavailable to him from official sources since their contents were secret.

But the record contains other substantial and impressive evidence of fraud in the form of Marco's deliberate concealment of extremely significant facts which reached him subsequent to his repudiation of the contract and which eliminated any doubt that plaintiff's device was patentable. As early as February, 1946, the patent examiner indicated that he would allow some of the claims made with respect to Marco 1 and 2. A legitimate inference is that Marco was so informed by his patent attorney within a reasonable time. Marco himself testified that before plaintiff executed the accord and the release he was possessed of knowledge that none of the patent applications conflicted with Foute and that there would be no litigation. Having with great alacrity purported to repudiate his contractual obligations toward plaintiff because of an alleged patent conflict and the threat of an infringement action, elementary business ethics, no less than the strict code of behavior exacted of a fiduciary, required Marco to disclose to plaintiff these changed circumstances, this altered state of his knowledge, prior to the execution of the accord and the release. "Deceit may be negative as well as affirmative; it may consist in suppression of that which it is one's duty to disclose, as well as in the declaration of that which is false." (*Gillespie* v. *Ormsby*, 126 Cal.App. 2d 513, 527 [272 P.2d 949].) In his work on Torts (2d ed.), Dean Prosser states: "One who has made a statement and subsequently acquires new information which makes it untrue or misleading must disclose such information to anyone whom he knows to be still acting on the basis of the original statement." (P. 534.) Section 551(2) of the Restatement of Torts reads: "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . (b) any subsequently acquired information which he recognizes as making untrue or misleading a previous representation which when made

was true or believed to be true." Comment (f) relating to clause 2(b), *supra*, states: "One who having made a representation which when made was true or believed to be so remains silent after he has learned that it is untrue and that the person to whom it is made in relying upon it in a transaction with him is morally and legally in the same position as if he knew that his statement was false when made."

It is the prevailing law that one who learns that his statements, even if thought to be true when made, have become false through a change in circumstances, has the duty, before his statements are acted upon, to disclose the new conditions to the party relying on his original representations. (*Childress* v. *Nordman*, 238 N.C. 708 [78 S.E.2d 757, 761]; *Chilson* v. *Houston*, 9 N.D. 498 [84 N.W. 354]; *Porter* v. *Beattie*, 88 Wis. 22 [59 N.W. 499]; *McGinn* v. *McGinn*, 50 R.I. 236 [146 A. 636, 638].) Had Marco furnished the information to plaintiff that the Foute patent was not a conflicting one and that the threat of legal action had disappeared, it would have rectified the impression which his earlier statements had created. There is no record that Marco ever gave this information to plaintiff and a jury would be entitled to infer plaintiff signed the accord and release in ignorance of the truth, which Marco studiously concealed from him. Why else would plaintiff discharge Marco from the valuable rights owed him under the contract, but for the fact that Marco failed to undo the misapprehension engendered by his representations, and by his silence and concealment perpetuated in plaintiff the delusion that his invention infringed on an earlier patent and that litigation was the anticipated result.

In the light of the facts and the controlling law, plaintiff established a prima facie case of actionable fraud. Marco contends, however, that such an action is barred by the statute of limitations. (Code Civ. Proc., sec. 338(4).) He relies on the fact that plaintiff made his alleged discovery of the fraud some seven years after he signed the accord and the release by "getting a copy of the Foute patent and examining it." He contends plaintiff "could and should have done exactly the same thing seven years before." However, Marco ignores the fact that seven years later plaintiff, having learned of the issuance of the patents, was able for the first time to compare the Foute patent with the Marco and Aves patents, whose contents he had never previously seen, and as a result of such comparison he was able to discover the fraud.

Section 338, subdivision 4, provides that a cause of action for relief on the ground of fraud is not to be deemed to have accrued until the discovery by plaintiff of the facts constituting the fraud. To come within the purview of this section, one who claims that the statute has been tolled because of his ignorance of the fraud must show when the fraud was discovered, the circumstances of the discovery, what the discovery was and why it was not discovered sooner. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 437-438 [159 P.2d 958]; *Tognazzini* v. *Tognazzini*, 125 Cal.App.2d 679, 687 [271 P.2d 77]; *Mortimer* v. *Loynes*, 74 Cal.App.2d 160, 171 [168 P.2d 481].) The fact that an investigation would have revealed the falsity of the misrepresentations will not alone bar recovery. (*Hobart* v. *Hobart Estate Co.*, *supra*; *Schaefer* v. *Berinstein*, 140 Cal.App.2d 278, 294 [295 P.2d 113].)

The applicable law has been well expressed recently in the Schaefer case, *supra* (hearing denied): "'The statute commences to run only after one has notice of circumstances sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry. 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances "a prudent man" would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery. The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.' (*Tarke* v. *Bingham*, 123 Cal. 163, 166 [55 P. 759].)

"In many cases it has been said that means of knowledge are equivalent to knowledge. This is true only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious. (*Lady Washington C. Co.* v. *Wood*, 113 Cal. 482 [45 P. 809].) Where there is a duty to investigate, the plaintiff may be charged with knowledge of the facts which would have been disclosed by an investigation; but where there is no prior duty to investigate, the statute does not run until he has notice or knowledge of facts sufficient to put a reasonable man on inquiry. 'In the absence of a duty to make inquiry, as pointed out above, the statute does not run merely because the means of discovery were available, and plaintiff is not compelled to disprove that such means existed. He need only establish facts sufficient

to show that he made an actual discovery of hitherto unknown information within three years before the filing of the action. . . . The requirement that plaintiff show what information he received or what suspicious facts came to his notice is imposed in order that the court may determine whether or not the discovery was made within the time alleged, that is, whether plaintiff actually learned something he did not know before.' (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 422 [159 P.2d 958].) . . .

''In cases involving confidential relationships, the rule requiring allegations stating the circumstances which are relied upon by the plaintiff as excusing prior discovery of the fraud is relaxed. (*Bainbridge* v. *Stoner*, 16 Cal.2d 423, 430 [106 P.2d 423].) In *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], the court points out that it is recognized that in cases involving a fiduciary relationship 'facts which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required.' [Citations.]''

From the evidence, we cannot hold as a matter of law that any of the circumstances known to plaintiff should have put a reasonably prudent person on inquiry. This is usually a question of fact. (*Neet* v. *Holmes*, 25 Cal.2d 447, 467 [154 P.2d 854]; *Schaefer* v. *Berinstein, supra,* p. 294; *Dabney* v. *Philleo,* 38 Cal.2d 60, 66 [237 P.2d 648].) The record shows that Marco's fraudulent concealment induced plaintiff to execute a release at a time when he believed Marco's statements, had faith in his integrity, and did not have the full means of investigation open to him. Having executed such release, plaintiff dissociated himself entirely from the aircraft industry, entered a new line of business, had no further contact with Marco, and, presumably because of his confidence in Marco, made no further inquiry as to the facts. The facts are not such as to make imperative a duty of continuous investigation or inquiry as the only reasonable course to be taken consistent with the exercise of ordinary prudence and judgment. (*Sears, Roebuck & Co.* v. *Blade,* 139 Cal.App.2d 580, 589-591 [294 P.2d 140]; *Dabney* v. *Philleo, supra.*) It was a question for the jury to determine whether plaintiff's delay was reasonable and excusable. It is not a question we can decide as a matter of law on these facts. The case of *Sibert* v. *Shaver,* 111 Cal.App.2d 833 [245 P.2d 514], involving the assignment of patent rights

between parties standing in a confidential relationship is deserving of reference in this context.

In the light of the various aspects of the case to which we have alluded, it is also clear that the accord and the release do not constitute a bar to appellant's cause of action at law upon his contractual claims. ▉ In view of the confidential relationship, and the fact that Marco obtained an unconscionable advantage by their execution, a rebuttable presumption arises that they were obtained by fraud (Civ. Code, § 2235; *Roeder* v. *Roeder,* 118 Cal.App.2d 572, 580 [258 P.2d 581]; *Chung* v. *Johnston,* 128 Cal.App.2d 157, 164 [274 P.2d 922]) and the burden was upon Marco of overcoming such presumption of fraud which arises by operation of law. (*Roeder* v. *Roeder, supra; Chung* v. *Johnston, supra; Highland Park Inv. Co.* v. *List,* 27 Cal.App. 761, 763 [151 P. 162].) ▉ Furthermore, the evidence shows that after discovering the fraud, plaintiff proceeded to rescind the accord and release. (Civ. Code, § 1691.) Such a rescission *in pais* annulled those documents and restored the parties to their rights and obligations under the contract. (*Bowman* v. *Victor,* 83 Cal.App.2d 693, 699 [189 P.2d 876]; *Loaiza* v. *Superior Court,* 85 Cal. 11, 31 [24 P. 707, 20 Am.St.Rep. 197, 9 L.R.A. 376].)

Although urged below, no contention is made on appeal that these contractual rights (counts 2 and 5) are barred by limitations. In the light of evidence of Marco's concealed fraud, such a defense cannot prevail as a matter of law. (*Sears, Roebuck & Co.* v. *Blade,* 139 Cal.App.2d 580 [294 P.2d 140].)

▉ There is no merit to Marco's contention that plaintiff's dismissal of his cause of action for rescission of the accord and release amounted to an affirmance of those instruments and confined him to his action for damages for the fraud inducing their election. In *Mackenzie* v. *Voelker,* 123 Cal.App.2d 538 [266 P.2d 867], plaintiff brought an action containing two counts based on fraud. The first was for rescission and was dismissed at plaintiff's request. At page 541 the court states "that if the complaint is considered as asking for two alternative remedies, plaintiff could not be held to have been committed to an affirmance or disaffirmance of the contract by so pleading. It was held in *Tanforan* v. *Tanforan,* 173 Cal. 270, 273 [159 P. 709], that it is proper practice to ask for inconsistent remedies and when all the evidence is in, it is then for the court to say to

which remedy plaintiff is entitled." In accord is *Karapetian* v. *Carolan*, 83 Cal.App.2d 344 [188 P.2d 809, 1 A.L.R.2d 1075].

The final question presented relates to the propriety of the nonsuit in favor of Marco Industries Company. That corporation was organized in 1947, with Marco as its president and sole stockholder. The record is silent as to any change of Marco's position in either capacity and the inference is justified that there was no such change at all times here material. In about 1948, Marco and defendant Marco Industries Company entered an agreement under which Marco assigned the patents to the company and granted it a license to manufacture the lights west of the Mississippi for a royalty of 10 percent of the sales. In 1953, a new agreement was executed under which Marco granted, assigned and sold "all of his right, title and interest" in the patents to the company for the sum of $300,000 payable in installments.

In view of Marco's position as president of the company, it is clear that the corporation is chargeable with full notice of plaintiff's royalty interest in the patents (*Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733, 738 [24 P.2d 971, 88 A.L.R. 1271]; *Bogart* v. *George K. Porter Co.*, 193 Cal. 197, 210 [223 P. 959, 31 A.L.R. 1045]; *Blue Diamond etc. Co.* v. *Industrial Acc. Com.*, 188 Cal. 403, 408 [205 P. 678]; *Eagle Indem. Co.* v. *Industrial Acc. Com.*, 92 Cal.App.2d 222, 225 [206 P.2d 877]), and that it took the transfer of Marco's right, title and interest in the patents subject to all claims and equities plaintiff could assert against the transferor. (*Western Oil etc. Co.* v. *Venago Oil Corp., supra,* pp. 737-738; *Dougherty* v. *California Kettleman etc., Inc.,* 9 Cal.2d 58, 81 [69 P.2d 155]; *Childs etc. Co.* v. *Shelburne Realty Co.,* 23 Cal.2d 263, 267 [143 P.2d 697].) Under the principles of the cases last cited, plaintiff was entitled to enforce his royalty rights in the patents against defendant company as a transferee with notice. The nonsuit in its favor was consequently erroneous.

We deem it advisable to reiterate, in order to avoid any unfortunate misunderstanding, that the observations we have made concerning Marco's fraud are based upon the evidence adduced by plaintiff alone and derive from the requirement that we must accord such evidence every beneficial intendment in support of plaintiff's case. It has not been our purpose, of course, to determine questions of the credibility of witnesses or any of the ultimate issues of fact.

The judgment of nonsuit in favor of defendants Vincent A. Marco and Marco Industries Company is reversed.

Moore, P. J., and Ashburn, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied February 27, 1957. Schauer, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.