[Civ. No. 20157.   Second Dist., Div. Two.   July 14, 1954.]

F. H. GILLESPIE, JR., Appellant, v. LEONARD D. ORMSBY, Respondent.

Ben C. Cohen, Alfred Lubin and Fletcher Bowron for Appellant.

Murchison & Cumming and Bicknell J. Showers for Respondent.

FOX, J.—In this action for breach of contract, with a cross-complaint raising issues of fraud and misrepresentations, plaintiff appeals from an adverse judgment.

By his amended complaint, plaintiff sought damages based on defendant's alleged breach of a contract relating to the drilling of an oil well known as the Fitzhugh-Wilhite No. 10 (hereinafter referred to as Well No. 10). Plaintiff alleged that he had substantially complied with all the terms of the agreement and that defendant had failed to contribute his agreed share of the drilling costs. Defendant's answer included as an affirmative defense plaintiff's failure to perform the obligations required of him by the contract. Defendant thereafter filed a cross-complaint asking damages in the sum of $10,000 for fraud and deceit, or, as an alternative, rescission of the agreement and return of the sum of $10,000 paid thereunder to plaintiff. During the trial defendant filed a supplemental cross-complaint to conform with the proof. In accordance with the findings, judgment was entered for defendant and cross-complainant in the sum of $10,000, plus interests and costs of suit.

The findings, omitting those which are surplusage or un-

necessary for the determination of the issues presented, are to the following effect: that plaintiff and defendant entered into a written contract under which plaintiff was designated as "operator" of Well No. 10, and defendant as "non-operator." The contract included the following provisions:

"2. On or before October 25, 1951, operator shall commence operations or cause operations to be commenced for the deepening of that certain oil and gas well located on said above described lands and designated as 'Fitzhugh-Wilhite #1* well,' and prosecute the drilling thereof until oil or gas is discovered in paying quantities, or until the depth of 1900 feet has been reached, or until such time as in the opinion of operator or his geologist the continuance of drilling operations would be undesirable or impractical.

"3. The cost of the deepening of said Fitzhugh-Wilhite #1 well, the completion thereof, or the plugging back and completion thereof from a depth less than 1900 feet shall be borne and paid for as follows:

"a. The cost of the drilling of said Fitzhugh-Wilhite #1 well from its present depth to the depth of 1900 feet, or less, as provided in paragraph 2 above shall be borne and paid for entirely by non-operator;

"b. In the event that a zone or zones are encountered between the present depth of said Fitzhugh-Wilhite #1 well and 1900 feet which such zone is worthy of testing in the opinion of operator or his geologist, then and in that event pipe shall be set and the zone tested and an effort made to place said well on production, the cost of the pipe, the setting thereof and all other completion costs to be borne and paid for—$\frac{2}{3}$ by operator and $\frac{1}{3}$ by non-operator;

"c. In the event that oil or gas is not encountered between the present depth of the Fitzhugh-Wilhite #1 well and the depth specified in paragraph 2 above, said well shall be plugged back to approximately 1100 feet, casing run, the well tested and an attempt made to complete said well and place the same on production, the cost thereof to be borne entirely by operator."

The contract was actually executed on November 2, 1951, although it is dated October 19, 1951.

The findings further recite that "oil and gas was not encountered at the 1900 foot level or thereabouts or at all in

---

*#1 is a typographical error. The reference at all times where #1 is used is to the No. 10 well.

paying quantities and . . . that it was the understanding and agreement of the parties to the said contract that the said oil to be found would be in paying quantities and that if not so found plaintiff would comply with paragraph 3c of the aforesaid contract . . . and expend plaintiff's funds to plug back to the 1100 foot level and there set casing and endeavor to make a producing well at that level . . . that the said plaintiff failed and intentionally refused to plug the said well back or to make any effort of partial compliance with the terms of the aforesaid paragraph 3c . . . that said paragraph was an integral part of the obligations and promises undertaken by the plaintiff and that plaintiff's failure to comply with his promise contained in the said paragraph 3c constitutes a material failure of performance.''

The court found as follows on the question of fraud: That at the time the contract was executed and during the negotiations prior thereto, plaintiff fraudulently represented to defendant that Well No. 10 was at the approximate depth of 1,100 feet and that plaintiff was advised that a commercially productive well could be produced at about 1,100 feet and that if casing were run and the well completed at that depth oil and gas would be produced in commercial quantities; that plaintiff further represented that there was a probability that greater quantities of oil and gas could be produced at or about the depth of 1,900 feet, and that if oil were not encountered between 1,100 and 1,900 feet the well could then be completed at 1,100 feet and oil and gas produced at that depth; that at the time these representations were made, plaintiff knew that a well could not be produced and that he did not intend to produce a well or plug back to the 1,100-foot level to endeavor to create a commercially productive well; that at the time the contract was signed, plaintiff suppressed the fact that the well had already been drilled to the depth of 1,930 feet and that he had in his possession laboratory tests and electric logs disclosing to him that the said well would not be productive at the 1,900-foot level, or at any other level or at all; that plaintiff knew that defendant was relying upon his representations; that defendant relied upon the representations of plaintiff and without further investigation signed the aforesaid contract and paid over to plaintiff the sum of $10,000, which plaintiff accepted well knowing that the contract as written could not and would not be performed and that at the time this money was paid and the contract signed

that he had no intention of plugging the said well back to the 1,100-foot level; that said well did not produce oil or gas in commercial quantities nor did plaintiff encounter oil or gas at any depth in the drilling of the well; that on about March 15, 1952, as soon as defendant learned of the untruth of the representations made, he served on plaintiff a notice of rescission of the agreement and a demand for the return of the $10,000 paid over by him.

Plaintiff's main contentions are that there is no substantial evidence to support certain of the material findings, hereinafter particularly identified, and that there was no obligation imposed on him by the contract to plug the well back to the 1,100-foot zone. We are unable to agree with these contentions.

Under familiar rules of appellate procedure, it will be sufficient to state the evidence which supports the findings and judgment, this court being bound by the findings of the trial court upon substantially conflicting evidence. The record shows that plaintiff and defendant were both members of the Wilshire Country Club and had become acquainted during a golf tournament on the club's links in about 1949 or 1950. At that time, plaintiff, who was a relatively young man, was desirous of establishing a career in the oil business. He inquired of defendant, a veteran in the petroleum industry, about general prospects in the oil business for one starting out. Defendant made various recommendations, and in particular advised him to attempt to acquire oil lands and leases which might be of interest to large producers. Plaintiff subsequently became active in the oil business.

In about September, 1951, plaintiff acquired an oil lease on certain acreage in the Poso Creek Oil Field, Kern County, on which was located a well known as Fitzhugh-Wilhite No. 10. In this area are two oil producing strata—an upper sand at 1,100 to 1,200 feet below the surface, and a lower sand at approximately the 1,900-foot level. Some wells in this area had been drilled to tap both the upper and lower oil zones. Well No. 10 had previously been drilled to a depth of 1,162 feet by one Wilhite, who had several corings and a Schlumberger electric log made. The cores were taken between 1,081 and 1,159 feet, but were not submitted for a core analysis because no possible productivity was indicated to Wilhite's geologist. Wilhite thereupon capped and formally abandoned the well on September 1, 1951.

Some time after plaintiff secured his lease he began nego-

tiations to obtain some drilling equipment from Wilhite. The latter informed plaintiff of his experience with the No. 10 well, advising him that he had not been able to put it into production at the 1,100-foot level and that he had finally abandoned it. He exhibited the cores he had taken to plaintiff, and gave him a copy of the Schlumberger log. From his own personal investigation of the area, plaintiff was apprised that another Wilhite well, located 100 feet away from Well No. 10, was producing only about seven barrels a day from about 1,100 or 1,200 feet, with considerable production difficulty. A. L. Hunter, a geologist employed by plaintiff, testified that about 15 barrels a day was the minimum production at this horizon which could be regarded as commercially feasible. Hunter also testified that when first consulted about the production potential of Well No. 10, he recommended to plaintiff that a new well be drilled at a different site on the leasehold.

The sequence of some of the succeeding events is shrouded in a degree of uncertainty because a part of the testimony given by the parties erroneously presupposed that the contract out of which this litigation grows was signed on October 19, 1951, the date which appears on the instrument. Both parties subsequently agreed that the written agreement was actually signed on November 2, 1951. The precise time when the parties initiated the oral discussions which culminated in their written contract is also in conflict. Defendant testified that this occurred four or five days before the contract was signed. Plaintiff testified that he first approached defendant about the middle of October, 1951, through a real estate broker named Mile, to procure financial backing for his projected oil venture. Defendant testified that plaintiff informed him of the fact that he had undertaken the drilling of Well No. 10 on the acreage he had leased. Defendant gave the following account of this initial conversation: plaintiff stated that the drilling of No. 10 was nearing the 1,100-foot level, and that he was prepared to set 10-inch pipe and make a production test at this horizon. He stated that there were some wells in the surrounding area which were producing 25 to 30 barrels of oil daily from the zone at this level; that although he had the financial means to complete the well at the 1,100-foot level, he was anxious to first explore the possibility of extracting oil from the 1,900-foot stratum. However, he did not have sufficient money to drill to this lower depth and he proposed

that defendant participate in his project by furnishing the capital required to reach and test the 1,900-foot zone. Defendant testified that plaintiff assured him he was planning to make a production test at 1,100 feet in any event; but assisted by defendant's financial participation, he would also be enabled to explore the lower sand which Hunter thought might prove productive. After a discussion of the overall plan of operations, defendant replied he was willing to invest $10,000 in such a venture and suggested that plaintiff instruct his attorney to draw up a contract embodying their agreement.

Mr. Mile, a broker who was a mutual friend of both plaintiff and defendant, testified that at plaintiff's request he had arranged the meeting at which plaintiff invited defendant to associate with him in the transaction last described. He testified that he was present during their first discussion, which took place about four or five days prior to the signing of the contract. Mile recalled that plaintiff stated that the No. 10 well had been drilled to about 1,100 feet or "perhaps a little better" and that he expected to make a producer out of it at that level. He confirmed that plaintiff told defendant he desired also to go down to the lower depth if he could get defendant to participate with an investment.

The draft of the proposed contract was drawn by Mr. Hightower, plaintiff's attorney, and was submitted to defendant about a day after the initial conversation. Defendant objected to some of its provisions and to the fact that it did not specify that his investment was not to exceed $10,000. Defendant discussed these matters with Hightower, who thereafter prepared the final draft of the contract, dated October 19, 1951, but actually signed on November 2, 1951, when defendant paid plaintiff $10,000.

While the negotiations which eventuated in the written agreement were in progress, plaintiff was proceeding with his project on Well No. 10. He started to work on the well on October 16 with the cleaning out of the cement hole to about 1,100 feet; redrilling operations were commenced on October 19. The deepening of the well continued until the maximum depth of 1,930 feet was reached on October 31, 1951. At that time, a Schlumberger electric log was made and core samples taken to the laboratory for analysis. The reports received by plaintiff of these tests were dated November 1, 1951, but Hunter had obtained a verbal report on the core analysis prior thereto. The results of the tests did not sug-

gest much promise of oil production on a commercial basis to Hunter, but he took the view that there could be no certainty of this without an actual production test, since the presence of some oil was indicated. A telephone call was made to defendant and both Hunter and plaintiff spoke to him. Hunter informed defendant of the unsatisfactory character of the reports but expressed the opinion that the zone should be explored. Plaintiff told defendant that he was planning to set pipe for a test. Defendant's reaction was that the decision was not his obligation, that plaintiff was the operator and it was up to him to do what he saw fit. The date of this telephone conversation is also in dispute. Plaintiff testified he placed the call from Bakersfield on the morning of November 2, just before he departed for Los Angeles for the signing of the contract. Defendant testified the report was communicated to him two or three days after the contract was signed.

The production test of the well commenced about November 8, 1951, and during the pumping operations, about 40 barrels of fluid were pumped from the well each day for some 30 days. Hunter estimated that this fluid contained 99 per cent water and 1 per cent oil; plaintiff estimated it was 95 per cent water and 5 per cent oil. Both plaintiff and Hunter agreed that this did not constitute a commercially profitable well. Operations on the well terminated on about January 1, 1952. Plaintiff made no attempt at any time to test the 1,100-foot level. He testified that on November 2, 1951, when the contract was signed, he had already decided to complete the well at 1,900 feet and he had no intention of plugging back to the 1,100-foot zone. Hunter, who was called as an expert witness in plaintiff's behalf, testified that the flow derived from the 1,900-foot level would not be considered as encountering oil by petroleum engineers or geologists in the community; that there is a distinction between receiving laboratory reports and analyses which would warrant the making of a production test and the encountering of oil and gas as that term or concept is understood by petroleum engineers and geologists. In his opinion there was nothing in the indications disclosed by the Schlumberger electric log and the core analysis report to cause a geologist or petroleum engineer to conclude that oil or gas had been encountered.

The record shows that at no time did defendant visit the premises where the well was drilled. Defendant testified

he had no personal knowledge of that area. He further stated that he had not obtained any information regarding the No. 10 Well from any source other than plaintiff, and that he relied exclusively on this information in entering into the contract. Plaintiff himself testified he knew defendant was relying on what plaintiff told him. Under cross-examination, defendant testified that so far as he was concerned, the primary object of his venture into the No. 10 project was to complete a well at the 1,100-foot level, where plaintiff "told me they were producing 25 to 30 barrel wells in that area." In March, 1952, defendant served upon plaintiff a notice of rescission of the contract, tendering back to plaintiff the return of all rights and benefits to which he was entitled under the contract.

Directing our attention first to plaintiff's contention that he had no contractual obligation "to plug the well from the 1900 foot zone to the 1100 foot zone after the well had been completed and tested at the 1900 foot zone," our examination of this issue may be coupled with a consideration of plaintiff's attack on the court's findings to the effect that (1) plaintiff did not substantially comply with the terms of the agreement, (2) that it was the understanding of the parties that if oil were not found in paying quantities plaintiff would plug back to 1,100 feet at his own expense, (3) that oil was not encountered at 1,900 feet and (4) that plaintiff's intentional failure to plug back to 1,100 feet as required by paragraph 3c of the contract constituted a material failure of performance. ■ The rules governing our inquiry are well established. "In construing a contract, the primary object is to ascertain and give effect to the intention of the parties. [Citations.] That intention must, in the first instance, be derived from the language of the contract. The words, phrases, and sentences employed are to be construed in the light of the expressed objectives and fundamental purposes of the parties to the agreement [citation]." (*Hensler* v. *City of Los Angeles*, 124 Cal.App.2d 71, 77, 78 [268 P.2d 12].) ■ It is likewise well settled that a written contract is to be construed strictly against its drafter. (*Burr* v. *Sherwin-Williams Co.*, 42 Cal.2d 682, 693-694 [268 P.2d 1041]; *Pacific Lbr. Co.* v. *Industrial Acc. Com.*, 22 Cal.2d 410, 422 [139 P.2d 892]; *E. A. Strout Western Realty* v. *Gregoire*, 101 Cal. App.2d 512, 517 [225 P.2d 585].) ■ Where necessary to gain the true intent of the parties, a court will consider the circumstances surrounding the execution of the agreement.

(Code Civ. Proc., § 1860; *Hay* v. *Allen,* 112 Cal.App.2d 676, 682 [247 P.2d 94].)

Considering the contract in its entirety and according to each segment a reasonably practical effect (Civ. Code, § 1641), it is patent that the fundamental objective of the venture embraced by the contract was to secure oil in paying quantities from Well No. 10. ▆▆▆ It is abundantly apparent from an analysis of the provisions of the contract and the circumstances under which it was executed, that the agreement imposed upon plaintiff the obligation, in the event oil was not encountered in paying quantities in the course of the deepening operations prescribed in paragraph 2, to plug back to 1,100 feet, run casing, test the well, and make an attempt to complete it at his own expense. This is clear in the first instance from a literal reading of paragraph 2, which specifically refers to the prosecution of the deepening operation with the objective of discovering oil or gas "in paying quantities" up to a maximum depth of 1,900 feet. Second, paragraph 3c recites that the plugging back to 1,100 feet is to occur "in the event that *oil or gas is not encountered* between the present depth . . . [of Well No. 10] . . . and the depth specified in paragraph 2 above . . ." (Italics added.) The court reasonably interpreted the reference to the encountering of oil and gas as meaning in paying quantities, or in the commercial sense. This was warranted for several reasons: (a) paragraph 3c, where the term is used, itself refers to paragraph 2, where the objective of securing oil "in paying quantities" is mentioned; (b) if paragraph 3c is ambiguous, it was properly construed in a sense favorable to defendant, since plaintiff's attorney drew up the contract, which was to be "interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654); (c) the court was aided by Mr. Hunter's testimony as to the interpretation of the term "encountering oil." Mr. Hunter's testimony was to the effect that the Schlumberger electric log and the core analysis reports, which indicated a high resistivity, were not *per se* regarded as encountering oil; high resistivity is as consistent with the presence of fresh water as oil. He also testified that he did not consider the fluid pumped at the 1,900 level—approximately 1 per cent oil and 99 per cent water— as meeting the criterion of "encountering oil" as that term is understood by petroleum engineers and geologists. Thirdly, the court's interpretation is further fortified by a considera-

tion of paragraph 4*, relating to the division of proceeds. Subdivision c-1 of this paragraph provides for the division of income in the event Well No. 10 is completed "as a commercial producer" pursuant to the deepening operations specified in paragraph 2; paragraph c-2 thereof provides for division of income in the event the well is completed "as a commercial producer" in accord with paragraph 3c (1,100-foot level). Clearly this provision was inserted to express the understanding that commercial production was the contractual objective, and to indicate that if income from No. 10 as a commercial producer were not achieved pursuant to the deepening operations, it was contemplated that it might be obtained at the 1,100-foot level. It is significant that the court's construction is compelled not only from the language used, but is in harmony with the testimony as to the circumstances attending the execution of the contract. It is plain that the transaction was presented to defendant as one which would give to the parties two strings to their bows—that the bargain was to attempt to get commercial production from 1,900 feet and if that failed, to revert to 1,100 feet. Defendant was to pay for the deepening—plaintiff for the plugging back, if necessitated. Defendant testified that he considered the possibility of getting oil from 1,100 feet of crucial importance in motivating his entering into the agreement.

In view of the foregoing, no merit appears in the argument that plaintiff was not obligated to plug back after the data on the electric log and core analysis showed a zone worthy of testing, which plaintiff contends is the equivalent of encountering oil. Furthermore, if this were so, since such data was available on November 1, 1951, to plaintiff, there was no necessity for including such sections as paragraph 3c and paragraph 4c(2) in the contract signed the next day. For under plaintiff's theory the obligation to plug back could not

---

*"4. . . . The proceeds from the sale of all oil or gas or other hydrocarbon substances produced, saved or sold from said well shall be accounted for and distributed as follows: . . .

"c. The remaining income, after the payment of the foregoing items, shall be divided between the parties and paid on the 25th day of each month for the preceding calendar month as follows:

"(1) In the event said well is completed as a commercial producer in accordance with the terms of paragraph 3a above, said income shall be divided—60% to operator and 40% to non-operator;

"(2) In the event said well is completed as a commercial producer in accordance with the terms of paragraph 3c above, said income shall be divided—75% to operator and 25% to non-operator. . . ."

arise since plaintiff had already "encountered oil" on November 1, before the contract was signed. Plaintiff also attempts, for some obscure reason, to make much of defendant's purported knowledge of the results of the Schlumberger and core tests before the contract was signed. Defendant denied such knowledge; but even if this information had been known to him, he could not have prevented plaintiff from testing at 1,900 feet, since paragraph 9* of the contract, as well as paragraph 3(b) thereof, vested in plaintiff discretion to test zones he deemed worthy. But even more devastating to plaintiff's position, supposing, as he claims, that defendant knew on November 1st that the oil tests at 1,900 feet were unpromising, is the fact that defendant nevertheless signed the contract on November 2d. This would be an indication that though he did not hold out much hope from a production test at 1,900 feet, he was counting on the possibility of oil at 1,100 feet when plaintiff performed his obligation of plugging back.

Equally untenable is plaintiff's argument that under paragraph 9 he "had the exclusive right to decide in the light of the facts as they might appear to him at the time of decision, whether or not the well should be plugged back to the 1100 foot level." The discretion there spoken of related simply to general operations and developmental plans; it cannot be given so unbridled an effect as would stultify the plain import of paragraph 3c and enable plaintiff to abrogate the contract which the parties had executed. Such a construction would render nugatory defendant's rights and make illusory and chimerical plaintiff's obligations. That even the operational discretion vested in plaintiff does not extend to all decisions is also suggested by paragraph 18† where the question of when further profitable operation of the well is no longer possible is made to depend on a joint decision of the parties.

Plaintiff argues that defendant permitted him to continue pumping operations for a month, knowing that the fluid

---

*"9. All of the decisions concerning the operations and development of the property subject to this agreement shall be made solely by operator."

†Par. 18 reads: "If the production from said leased premises reaches the point, in the opinion of both of the parties hereto where they can no longer be operated at a profit the well or wells thereon shall be abandoned and all of the jointly owned equipment then on the leased premises shall be salvaged and sold and the proceeds thereof divided in accordance with paragraphs 4c(1), 4c(2) or paragraph 5, as the case may be. The parties hereto shall bear their proportionate part of the costs of abandoning any and all of said wells in like manner."

pumped out of the well was 95 per cent water, without requesting him to plug back to 1,100 feet. As indicated, it was for plaintiff, as operator, to decide how long the pumping operations should continue. Furthermore, plaintiff was not prejudiced by defendant's failure to request him to plug back, assuming there was a duty to make such request, since plaintiff testified he did not intend to plug back after November 2, 1951.

Plaintiff vainly seeks to escape the obligation of plugging back by asserting the defense of commercial frustration— namely, since there was very little indication of getting oil in paying quantities from 1,100 feet he should not be required to make a production test. This argument is entirely specious. ■ The doctrine of frustration is no excuse for nonperformance where there has been no supervening, unforeseeable event and where all the material facts affecting plaintiff's duty of performance were known to him at the time the contract was made. (*Lloyd* v. *Murphy,* 25 Cal.2d 48, 54 [153 P.2d 47]; *McCulloch* v. *Liguori,* 88 Cal.App.2d 366, 372 [199 P.2d 25].)

■ For the reasons stated, there was substantial evidentiary support for the court's findings that plaintiff did not comply with an integral obligation under the agreement in intentionally failing to plug back to 1,100 feet and that this constituted a material failure of performance. Such findings, independent of the findings of fraud, are sufficient to support the trial court's conclusion that plaintiff had breached the terms of the contract and that defendant was entitled to rescind and recover his $10,000. The language used by this court in *Wilson* v. *Corrugated Kraft Containers,* 117 Cal. App.2d 691, 696 [256 P.2d 1012], is here singularly apposite: "That plaintiffs' willful departure from a fundamental obligation under the contract constituted a material violation thereof is too apparent to admit of controversy. [Citation.] Where, as here, the contract was manifestly an entire and indivisible one with interdependent covenants [citation] and plaintiffs' default in performance went to the very root of the consideration bargained for, such breach amounted to a failure of consideration, entitling defendant to rescind." ■ In this connection, it is immaterial that the theory upon which the judgment may be affirmed is not identical with that relied upon by plaintiff or by the trial court, since "the trial court's judgment must be affirmed if the findings, supported by the evidence, are sufficient to warrant the relief granted on any

legal theory." (*Sears* v. *Rule*, 27 Cal.2d 131, 140-141 [163 P.2d 443]; *Hay* v. *Allen*, 112 Cal.App.2d 676, 681 [247 P.2d 94]; *Estate of Raphael*, 91 Cal.App.2d 931, 940 [206 P.2d 391].)

In any event the judgment may also be sustained on the ground that certain material representations made by plaintiff to induce defendant to enter into the contract were fraudulent, were relied on by defendant to his detriment, and afforded him a complete right to rescind. Both defendant and Mr. Mile testified that plaintiff represented to defendant that he had a well which he could make into a commercial producer at 1,100 feet. The court found that this representation was made and that plaintiff knew when he made it that a commercial well could not be produced at that level. Plaintiff argues that this constituted a statement of opinion upon which fraud may not be predicated. While this is, of course, generally true, it is subject to the exception that the opinion must in fact be honestly entertained. As stated in *Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561, 573 [126 P. 351, 42 L.R.A.N.S. 125]: "But bearing in mind that an expression of an opinion, is honestly made, is an expression of what the speaker *believes to be* a fact, it becomes apparent that by the expression of a dishonest opinion to one entitled to rely upon it, deceit is practiced, injury may be worked, and an action will lie." From the facts: (1) that plaintiff was fully informed of Wilhite's unsuccessful operation and abandonment of Well No. 10; (2) that Hunter had advised him to drill at a different site; and (3) that he knew that a well only 100 feet away was producing only seven barrels of low gravity oil a day, the court was justified in finding that plaintiff had no honest belief in his representation and that it was fraudulent. Furthermore, despite his knowledge of these facts, and knowing that defendant was relying upon his information, plaintiff did not disclose any of these matters to defendant. "Deceit may be negative as well as affirmative; it may consist in suppression of that which it is one's duty to declare, as well as in the declaration of that which is false." (12 Cal.Jur. 770.) Thus, it is a rule of general application, in dealing with the question of false representations, that one who speaks is not only obligated to tell the truth but he is equally bound not to suppress or conceal any facts within his knowledge which materially qualify those stated. (*Rogers* v. *Warden*, 20 Cal. 2d 286, 289 [125 P.2d 7]; *Milmoe* v. *Dixon*, 101 Cal.App.2d

257, 260 [225 P.2d 273]; *Boas* v. *Bank of America,* 51 Cal. App.2d 592, 597 [125 P.2d 620]; *Dyke* v. *Zaiser,* 80 Cal.App. 2d 639, 652 [182 P.2d 344].) If he speaks at all, he must make a full and fair disclosure. (*Pohl* v. *Mills,* 218 Cal. 641 [24 P.2d 476]; *Milmoe* v. *Dixon, supra; Boas* v. *Bank of America, supra.*) Under these legal principles, the trial court was justified in finding that plaintiff's representation was one which he could not have honestly believed and that it was made in bad faith.

The court found also that at the time plaintiff signed the contract on November 2, 1951, and accepted defendant's money, he had no intention of plugging the well back to 1,100 feet. As has been established, it was one of plaintiff's covenants under the contract to do so in the event oil was not discovered in paying quantities at 1,900 feet. Yet plaintiff himself testified that on November 2, 1951, when he submitted the contract drawn by his own attorney containing that promise among its terms for defendant's signature, he had no intention of completing a well at 1,100 feet at any future time. ▮▮▮ A promise made without any intention of performing it falls within the statutory definition of fraud (Civ. Code, § 1572, subd. 4); and such fraud may serve as the basis of an action for rescission of a contract. (*Tsang* v. *Kan,* 78 Cal.App.2d 275, 281 [177 P.2d 630]; *Wilson* v. *Rigali & Veselich,* 138 Cal.App. 760, 765 [33 P.2d 455].)

Plaintiff argues that the court erred in finding that defendant relied on plaintiff's representation and asserts that defendant made his own independent investigation. In support thereof, he quotes a part of Mr. Hunter's testimony of a telephone conversation he had with defendant, in which Mr. Hunter testified that before the operation was started, he believed he discussed with defendant the probability of economic production at the 1,100-foot level. Plaintiff omits from his quotation Mr. Hunter's testimony a moment before that he did not recall that anything was said by him or defendant about the possibility of production at the 1,100-foot zone. The chief topic of discussion was the 1,900-foot level and Mr. Hunter's recollection of it was generalized, fragmentary and, as noted, so nebulous and uncertain in regard to the 1,100-foot zone, that it was obviously discounted by the trial court. ▮▮▮ It chose, instead, to credit defendant's testimony that he relied exclusively on the representations made by plaintiff, who alone supplied him with information regarding Well No. 10. Since this evidence supports the finding

that defendant made no independent investigation, the fact that there was evidence from which the arbiter of the facts could have reached a different conclusion does not impeach the finding made.

Since these findings amply support the judgment, it is unnecessary to consider plaintiff's criticism of other findings, which he repeatedly characterizes as not being supported by "one scintilla of evidence." Suffice it to say that they stem from his intransigent unwillingness to regard any of defendant's testimony as being substantial evidence and his reluctance to accept the rule that it is *not* the province of an appellate tribunal to reappraise the evidence, re-evaluate the credibility of witnesses, to resolve conflicts in the evidence, or to draw inferences contrary to those drawn by the trial court.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 8, 1954.