[No. B008766. Second Dist., Div. Four. Dec. 11, 1986.]

NORTHRIDGE HOSPITAL FOUNDATION,
Plaintiff, Cross-defendant and Appellant, v.
PIC 'N' SAVE NO. 9, INC., et al.,
Defendants, Cross-complainants and Appellants.

## COUNSEL

Musick, Peeler & Garrett, Richard D. Dear, Cheryl S. Nakazawa, John S. Murray, Moneymaker & Kelley, Thomas J. Kelley, Horvitz, Levy & Amerian, Ellis J. Horvitz, O'Melveny & Meyers and Everett B. Clary for Plaintiff, Cross-defendant and Appellant.

Caditz & Grant, Allan M. Caditz, Paul R. Torre, McKenna, Conner & Cuneo, Aaron M. Peck and Stephen E. Traverse for Defendants, Cross-complainants and Appellants.

## OPINION

**KINGSLEY, Acting P. J.**—This is an appeal from a final judgment in favor of plaintiff and cross-defendant Northridge Hospital Foundation (N.H.F.) and from an interlocutory order denying the sublessee leave to file an amended cross-complaint against the plaintiff for intentional interference with an advantageous contractual relationship and injury to property based upon the sublessor's termination of the overlease.

Donald and Miriam Shandeling, owners of the subject property, leased space to W. T. Grant & Co., (Grant) by a lease that expired July 31, 1981, but which could be extended for two successive ten-year terms. Under the lease, Grant also could sublease with the owners' consent. Grant, with

consent of the Shandelings' successor-in-interest, Shorr, subleased the premises to Pick 'N' Save (P.N.S. or appellant). The sublease was drafted by the subleasor, Grant, and provided that the original term of the sublease was to end one day prior to the initial term of the master lease, and that P.N.S. had the option to extend the sublease for two successive terms by giving notice to Grant 180 days or more prior to the expiration of the then existing term. The sublease said that the sublease was subject to the master lease, and that in the event the "overlease shall terminate for any reason whatsoever, then this lease shall also terminate simultaneously therewith and neither party hereunder shall acquire any right or cause of action against the other by reason of such termination."[1] The lease also called for payment of rent.

N.H.F. planned to purchase the property from "Shorr," but it disapproved of the options of the tenants to extend the leases beyond 1981, so the close of escrow was extended. However, the amendments to the outstanding leases, including the sublease, were not obtained. N.H.F. refused to proceed with the purchase unless the sublease was amended to provide for mutual cancellation on six months notice and to provide for the reduction and relocation of property. N.H.F. submitted to P.N.S. an agreement providing for the above, but P.N.S. refused to sign the draft consent agreement. P.N.S. submitted a "modified consent agreement" eliminating the provision permitting either party to terminate the sublease on 180 days' notice, and instead submitted a statement that the lessee can continue the lease and its extension. N.H.F. did not sign the modified consent agreement, and it reduced and relocated the parking.

N.H.F. and Grant entered into an agreement which stated that the master lease was terminated, that the sublease is not extended, and that N.H.F. would indemnify and hold harmless Grant from claims by P.N.S. N.H.F. informed P.N.S. that the termination of the master lease terminated the sublease under paragraph No. 14, and P.N.S. protested the termination by letter from its counsel.

---

[1]Paragraph 14 of the sublease reads in part as follows: ". . . 14 The Landlord [Grant] covenants, warrants and represents that it has full right and power to perform this lease and to grant the estate demised herein, and covenants that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises during the full term of the lease, except as hereinafter set forth. The Landlord further covenants, warrants and represents that it is the holder of a leasehold interest in the demised premises pursuant to [the Master Lease referred to in the Sublease as] the overlease. It is specifically understood and agreed that this lease [the Sublease] and each and every provision thereof is and shall remain subject to said overlease and each and every provision thereof, and that in the event that said overlease shall terminate for any reason whatsoever, then this lease shall also terminate simultaneously therewith and neither party hereunder shall acquire any right or cause of action against the other by reason of such termination."

P.N.S. and N.H.F. entered into an agreement designed to preserve the status quo pending the litigation and to discuss the dispute, pending instituting litigation. N.H.F. waived its rights to file for summary proceedings under sections 1159 to 1179a of the Code of Civil Procedure (to obtain possession of the premises) until a final judicial determination, stating that "it is the intention of the parties that such judicial determination shall be on the merits, unrestricted by the limitation of an unlawful detainer proceeding." N.H.F. agreed not to "institute an unlawful detainer proceeding until its rights to possession of the property had been established in a separate prior action," and stating that nothing herein shall prevent N.H.F. from filing an unlawful detainer action. P.N.S. preserved its claim against Grant and agreed to perform all the conditions of the sublease during the pendency of any action. The parties met and conferred following the execution of the status quo agreement, but discussions were broken off in October 1972.

Eight years elapsed. N.H.F. accepted rent during that period. In 1979 N.H.F. wrote a letter to P.N.S. saying the sublease would terminate on July 30, 1981, and the sublease would not be renewed. P.N.S. informed N.H.F. that it had an option to renew, and thereafter, P.N.S. informed N.H.F. that it was giving notice to renew its option.

N.H.F. sued for declaratory relief, claiming that (1) P.N.S. was a tenant at sufferance since 1972 and was liable for reasonable rental value from that date and (2) that the effect of an N.H.F.-Grant agreement was to assign the sublease from Grant to N.H.F., and damage was in the amount of the difference between the fair rental value of the demised premises and the rental provided for under the sublease from the effective date of the alleged expiration of the sublease.

P.N.S. answered and claimed that the action was barred by statute of limitations and laches, and also cross-complained for declaratory relief, damages and injunctive relief, claiming that there is a valid sublease and option to renew.

By stipulation the parties agreed to a bifurcated trial.

The trial court found that paragraph No. 14 caused the sublease to terminate under its plain language and even if paragraph No. 14 could not be given its literal meaning, Grant had no obligation to exercise its option to extend the overlease. P.N.S. sought to amend to state a cause of action by P.N.S. in tort for intentional interference with P.N.S.'s rights under the

sublease.[2] P.N.S.'s motion to amend to add a cause of action for "tortious interference with Pic 'N' Save's sublease use" was denied.

In the second phase of the trial, the court issued its tentative decision for N.H.F. It also found that N.H.F. never signed or orally assented to the modified consent agreement, that N.H.F.'s claims were not barred by laches or the statute of limitations in that "N.H.F., in the Status Quo Agreement, waived its right to assert" that the sublease was terminated by virtue of the N.H.F.-Grant agreement, that the rental under the sublease agreement was the reasonable rental value and notwithstanding the status quo agreement the trial court has jurisdiction under Code of Civil Procedure section 1174 to provide relief. The court found P.N.S. liable for "treble damages for the period from the date of the notice of intended decision following the first phase of trial until the premises are vacated." The court found retention after August 10, 1982, was "malicious."

■ Appellant P.N.S. first argues that the voluntary surrender of the master lease by Grant to N.H.F. under the N.H.F.-Grant agreement could not, in and of itself, terminate the sublease. ■ The general rule is that the rights of a subtenant cannot be affected by a voluntary surrender of the

---

[2]"In particular, Pic 'N' Save alleged that '[t]he Sublease granted cross-complainant [Pic 'N' Save] the right to extend the term of the Sublease for two successive ten year periods upon the same terms, conditions, covenants and agreements as are set forth in the Sublease'; that '[o]n November 6, 1980, cross-complainant gave Northridge [NHF] timely and proper notice of cross-complainant's [NHF's [*sic*]] exercise of its right to extend the Sublease term for ten years' and hence 'cross-complainant had a property interest in' the demised premises consisting of 'a right to possess said premises as tenant until July 30, 1991 with an option to extend for an additional ten (10) year period'; that '[i]n February, 1972 . . . [NHF] knew of the contractual relationship (the Sublease) between W.T. Grant Company and' Pic 'N' Save, and 'was familiar with the terms of the Sublease including paragraph 14 . . . which Northridge [NHF] contends provided that the Sublease was terminated' and 'commenced negotiations with representatives of W.T. Grant Company to induce W.T. Grant Company to terminate the Sublease and the right of . . . [Pic 'N' Save] to occupy the Premises for any period of time'; that '[s]aid conduct of Northridge was intended to disrupt the contractual relationship between W.T. Grant Company and . . . [Pic 'N' Save] and destroy the right of . . . [Pic 'N' Save] to possession of the Premises'; that '[o]n or about February 23, 1972, Northridge and W.T. Grant Company signed a document . . . [the NHF-Grant agreement, under which they], over the objection of . . . [Pic 'N' Save] terminated and cancelled the Master Lease . . . conditional upon Northridge's obtaining title to the shopping center of which the [demised] premises is a part'; that 'Northridge induced W.T. Grant Company to sign the . . . [NHF-Grant agreement] for the sole purpose and with the intent to terminate and cancel the Sublease and to disrupt the right of . . . [Pic 'N' Save] to possession of the premises'; that '[o]n March 17, 1982, Northridge obtained title to . . . [the subject property and the NHF-Grant agreement] thereupon became effective'; that '[u]nder this Court's Notice of Tentative Decision . . . [the NHF-Grant agreement] resulted in an actual disruption of the contractual relationship between W.T. Grant Company and . . . [Pic 'N' Save] the effect of which, however, was postponed under the [s]tatus [q]uo [a]greement until the institution of' the action below by NHF; and that as a result Pic 'N' Save suffered various items of damage."

master lease. (*Buttner* v. *Kasser* (1912) 19 Cal.App. 755, 760-761 [127 P. 811]; *Herman* v. *Campbell* (1948) 86 Cal.App.2d 762, 765 [195 P.2d 801].) However, in the case at bench, N.H.F. argues that this is not an ordinary voluntary termination, but a case where the parties contracted in the sublease (in par. No. 14) that a termination of the master lease terminates the sublease. N.H.F. reasons persuasively that in a case where the master lease terminates the sublease, the general rule of the *Buttner* case is inapplicable. ██ ██ Therefore, the question before this court is whether paragraph No. 14 permits the lessee to terminate the sublease by the voluntary termination of the master lease.[3]

██ Although the statement in paragraph No. 14 of the sublease that if the overlease should terminate "for any reason whatsoever," [the sublease will simultaneously terminate] appears to be straightforward,[4] and voluntary termination of the master lease can certainly be said "to be [for] any reason whatsoever," we must nevertheless analyze this phrase in the light of both existing case law discussing the use of similar phrases in leases, and in the light of rules developed to guide the courts in interpreting the language in contracts and in leases. We will read paragraph No. 14 not only as a group of ordinary English sentences, but also as a group of sentences that are subject to rules on interpretation of leases, and subject to analysis set forth in cases interpreting similar or related phraseology in leases or contracts.

██ We note first that any uncertainty in a contract is construed against the drafting party (*Gillespie* v. *Ormsby* (1954) 126 Cal.App.2d 513, 514 [272 P.2d 949]) and forfeitures are disfavored. (*ABI, Inc.* v. *City of Los Angeles* (1984) 153 Cal.App.3d 669, 682-683 [200 Cal.Rptr. 563].) ██ The language of a contract must be read for the general intent of the parties (*County of Marin* v. *Assessment Appeals Bd.* (1976) 64 Cal.App.3d 319 [134 Cal.Rptr. 349]) and harsh results and unfair results should be avoided. (*Howe* v. *American Baptist Homes of the West, Inc.* (1980) 112 Cal.App.3d 622, 626-627 [169 Cal.Rptr. 418].) ██ The burden of establishing a forfeiture is on the party claiming the right. (*Wagner* v. *Shapona* (1954) 123 Cal.App.2d 451, 462 [267 P.2d 378] (overruled on another point in *Neff* v. *Ernst* (1957) 48 Cal.2d 628, 634 [311 P.2d 849].)

---

[3]Where there is no extrinsic evidence or where the extrinsic evidence is uncontradicted, the interpretation of a written instrument is solely a judicial function, and the reviewing court may substitute its interpretation for that of the trial court. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) In the case at bench, the extrinsic evidence was limited.

[4]Words in a written contract must be given their ordinary and popular sense unless there is evidence the parties intended otherwise. (*Harvard Investment Co.* v. *Gap Stores, Inc.* (1984) 156 Cal.App.3d 704, 714 [202 Cal.Rptr. 891].)

Appellant relies on *Byrd* v. *Peterson* (1947) 66 Ariz. 253 [186 P.2d 955, 956]. In the *Byrd* case, lessee of space in an office building, Butterfield, sublet the premises to the Byrd group. The sublease stated that "'at the expiration . . . of this lease [referring to the sublease] or of . . . [the overlease under which Butterfield leased the premises] whichever is earlier in time, peaceable possession of said premises shall be given to the party of the first part. . . .'" The overleases were terminated by mutual consent of the landowners and Butterfield, and the landowners sued in unlawful detainer against the Byrd group, the sublessees, to recover possession of the premises. The Arizona Supreme Court reversed the judgment below and found that the termination provision in the sublease would not terminate the sublease by a voluntary termination of the overlease. The court said, at page 958, that the lease must be read as a whole to gather the intent of the parties, and that the sublessor was not authorized to "terminate the original lease for and on behalf of sublessees."

However, in the *Byrd* case the language relied upon by the court is sufficiently different from the language in the lease at bar, that the analysis in *Byrd* provides little assistance with our own analysis. In the case at bench, the lease called for termination of the sublease where the master lease "shall terminate for any reason whatsoever," that the holding in *Byrd* is not relevant because there was no language in *Byrd* even vaguely similar to the language of paragraph No. 14.

Appellant next relies on *Texas Co.* v. *Adelman* (1939) 186 Okla. 663 [99 P.2d 874, 127 A.L.R. 945]. The Texas Company subleased to Adelman and Venator for a term which exceeded the overlease. The sublease had a clause which provides that the sublease "'shall automatically terminate upon the termination, cancellation or expiration of said lease between lessor [the Texas Co., sublessor] and the owner of the demised premises.'" (99 P.2d at p. 875.) The Texas Company had an option to renew for a period that would have included the period of the sublease. The Texas Company, sublessor, on appeal argued that the above quoted clause in the sublease permitted them to terminate the sublease. The Oklahoma court said that the quoted language was not clear and unequivocal as to whether it was inserted to protect the "lessor from contingencies not within its reasonable control" or whether the language gave the lessor the right to terminate the sublease by not exercising its option.

The court said: "We do not dispute the sublessor's right to have reserved the privilege to terminate the present lease for reasons wholly within its own choice, but such a reservation would be obviously for the benefit of the lessor, and contrary to the tenor of the contract as a whole, and such a

right should be clearly expressed to be effective. This lease was prepared by, and on a form of, The Texas Company, and any doubt as to the meaning of such paragraph should be interpreted most strongly against the party who caused the uncertainty to exist. [Citations.]

"It is urged that the sublessees were charged with knowledge of the terms of the Newton lease. Even so, The Texas Company was likewise so charged. Had sublessees examined the Newton lease at length and in detail they would have seen therefrom that their lessor, The Texas company, had the absolute right thereunder to hold the premises for a period beyond the expiration date of the present lease, and they would not have been informed thereby that their lessor did not intend to continue to so hold the same. On the contrary, the knowledge of the right given The Texas Company under the Newton lease, together with the insertion by it of the specific expiration date of December 30, 1937, is reasonably calculated to lead them to believe that their lessors intended to continue to hold under the Newton lease. We think the present lease reasonably indicates an intention on the part of The Texas Company to continue to hold under the Newton lease at the time it entered into the present lease contract. If it desired to retain the right to reserve its decision in that regard, or to change its intention thereafter it could easily have so provided by appropriate language in the contract, to the end that no one would have been confused or mislead thereby. The sublease as written implies an intention and agreement to exercise the option to extend the Newton lease." (99 P.2d at p. 876.)

The *Texas Co.* case is determinative here. The termination language in the *Texas Co.* case ("this [sub]lease shall automatically terminate upon the termination, cancellation or expiration of said lease between lessor [the Texas Company] and the owner of the demised premises"), while not exactly like the language of paragraph No. 14 of the instant case (which calls for the termination of the sublease if the "overlease shall terminate for any reason whatsoever"), is sufficiently similar so that the reasoning of the *Texas Co.* case is instructive in the case at bench.

In the *Texas Co.* case the court held that had the sublessee examined the Newton lease, they would have seen that the lessor, the Texas Company, had an absolute right to hold the premises for a period beyond the expiration of the present lease. The *Texas Co.* case court reasoned that the knowledge of this right "together with the insertion by it of the specific expiration date . . . is reasonably calculated to lead them [sublessee] to believe that their lessors intended to continue to hold under the Newton lease." (99 P.2d 874 at p. 876.)

In the case at bench, although the realty below was not sublet to P.N.S. for a definite term extending beyond the lease, the lessee had an absolute option to renew and the sublease to P.N.S. also contained an absolute option to renew. Therefore, just as in the *Texas Co.* case, the sublease herein would be held to contain an implied agreement of the sublessor to protect its sublessee, by requiring that the sublessor exercise its option to extend the lease from the owner, in the absence of clear and unequivocal language to the contrary. And just as the *Texas Co.* court held that the implied agreement was not negated by the particular language in the sublease, relating to termination before the end of the term ["in the event the lease between owner and sublessor terminated, is cancelled or expires"], the particular termination language in the case at bench also did not negate the implied agreement, because a clearly contrary intention was not disclosed. The language in the case at bench was no more expressive of such a clearly contrary intention, than was the language in the *Texas Co.* case.

The fact that the sublessor herein granted the sublessee herein an option to renew, rather than sublet the realty for a definite term extending beyond the present lease, as in the *Texas Co.* case, is not sufficient to distinguish the *Texas Co.* case from the instant case.

Although in the case at bench the sublessor did not sublet the realty for a definite term extending beyond the present lease, the sublessee had options to renew, and the existence of these options to renew the lease were reasonably calculated to lead the sublessees to believe their lessors intended to continue to hold under their lease. Granting an option to renew a sublessee is as indicative of the sublessor's intent to hold under the lease as is the subletting of the realty for a definite term extending beyond the present lease.

Appellants finally rely on *Morgan Plan Company, Inc.* v. *Vellianitis* (1959) 270 Ala. 102 [116 So.2d 600, 604] in which a sublease provided that "'[i]n the event that this lease is cancelled . . . for any reason or terminates for any reason, the cancellation or termination . . . shall automatically terminate any right that the Lessee may have had under the terms of this lease, to renew the lease for an additional term or terms.'" The Supreme Court found that this phrase did not grant the sublessor the right to terminate for any reason. However, since the Morgan Plan Company sublease "contained an agreement that Morgan Plan [sublessee] should have the same rights and privileges of renewal as were accorded Vellianitis [sublessor] by Helen R. Meaher [master lessor]," (116 So.2d at p. 601) and the case at bench contains no similar language granting that renewal privileges were to be the same

as Grant's privilege, the *Morgan Plan Company* case does not really assist plaintiff in its argument. It simply is not close enough in its facts to the instant case to clarify the problem at bench.

We note that in the case of *Wagner* v. *Shapona*[5] (1954) 123 Cal.App.2d 451 [267 P.2d 378], (a case not involving a sublease) the lessor sought to cancel based on the language permitting cancellation "'for causes not otherwise mentioned in this lease.'" The court asked if the word "causes" refers to "any reason whatsoever at the mere whim of lessors" or must it indicate some cause ordinarily recognized under law as a valid cause for cancellation? (123 Cal.App.2d at pp. 460, 461.) The language (causes not otherwise mentioned in this lease) was interpreted by the court in a manner to avoid forfeiture, and against the lessors who prepared the lease. However, the language in the *Wagner* case was not sufficiently similar to the case before us to assist in our analysis. "For any cause whatsoever" is far broader than "for causes not otherwise mentioned in the lease."

■ Whether or not a writing is ambiguous is a question of law and the trial court's determination of that question is not binding on the appellate court (*Lane-Wells Co.* v. *Schlumberger etc. Corp.* (1944) 65 Cal.App.2d 180 [150 P.2d 251]; *Wagner* v. *Shapona, supra,* 123 Cal.App.2d at p. 460). The lower court's finding that the language of paragraph No. 14 is "certain" is therefore not binding on this court. ■ Although the language of paragraph No. 14 might be construed as not ambiguous if viewed as an ordinary English sentence in an ordinary writing that has no legal consequences, when paragraph No. 14 is read in terms of the light of existing case law, and in accordance with the rules on interpretation of written instruments, we must conclude that paragraph No. 14 is ambiguous and insufficient to cause a forfeiture. Since the uncertainty is construed against the drafting party (*Gillespie* v. *Ormsby* (1954) 126 Cal.App.2d 513, 514 [272 P.2d 949]), and the burden of establishing the forfeiture is on the claiming party, herein N.H.F., and since it appears to be the general intent of the parties herein that P.N.S. would be able to renew their lease if they so chose, it follows that paragraph No. 14 must be construed against N.H.F. and as not permitting a forfeiture of P.N.S.'s rights.

The court below found that "[e]ven if paragraph #14 were not to be given its literal meaning, providing for termination of the sublease upon termination of the Master Lease, there is no legal or factual basis for implying an obligation on the part of Grant or N.H.F. as its successor, to exercise the option to extend the overlease [Master Lease], for the benefit of the

---

[5]Overruled in 48 Cal.2d 628, 634 [311 P.2d 849], *Neff* v. *Ernst* (1957), on another point.

sublessee, Pic 'N' Save [P.N.S.] and [t]hus Pic 'N' Save [P.N.S.] could not claim that the option in the sublease extended its right to occupy or to use the premises." The issue then is whether the lessee (sublessor) is impliedly obligated to the sublessee that it will renew the master lease in order to make the extra term available for the renewal of the sublease.

When a sublessor has covenanted with a sublessee that the sublessor would exercise his option to renew the master lease with the landlord, and he did not do so, the sublessee was entitled to damages caused by the breach. (*Gilman* v. *Nemetz* (1962) 203 Cal.App.2d 81, 90-92 [21 Cal.Rptr. 317, 94 A.L.R.2d 1332]; Johnson & Moskovitz, Cal. Real Estate Law and Practice, § 172.44[22], pp. 172-173.) The *Gilman* case dealt with an express covenant to exercise the option to renew the lease, and therefore is not authority for the proposition that a sublessor has a duty to exercise its option to renew the lease in the absence of an express contractual provision to that effect.

Nevertheless, we find that such an obligation to renew the lease is implied from the facts.

If we are to hold that a sublessor may not terminate the sublessee's lease by virtue of the language of paragraph No. 14 on the grounds that the above language in paragraph No. 14 is not sufficiently specific, it logically follows that the sublessor has an obligation to renew his own lease so that the sublessee could renew its option.

In *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837], a landlord-tenant case dealing with covenants against assignment and against subletting, the court stated that a lease is a contract, and that there is in every contract a duty of good faith and fair dealing. Quoting from *Cohen* v. *Ratinoff* (1983) 147 Cal.App.3d 321, 329 [195 Cal.Rptr. 84], the court said (at p. 500): "Thus, '[i]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . . .' (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [128 P.2d 665]. See also *Bleecher* v. *Conte* (1981) 29 Cal.3d 345, 350 [213 Cal.Rptr. 852, 698 P.2d 1154].) '[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' (*Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496]. See also, *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 640 [162 Cal.Rptr. 52].)"

Similarly, in the case at bench, there is a duty to renew the lease, because to fail to do so would injure the rights of the sublessee and there is an implied contract that the sublessor will not do anything that injures the sublessee.

## I

Appellant argues that the case is barred by laches on the grounds that N.H.F. did not file its suit until November 1980, more than eight years after the cause of action accrued. The affirmative defense of laches requires that there be unreasonable delay in bringing suit, plus either acquiescence in the act about which the plaintiff complains, or prejudice to the defendant resulting from the delay. Laches is a question of fact to be determined by the trial court in light of all the applicable circumstances, and in the absence of manifest injustice or lack of substantial support in the evidence, the trial court's determination will be sustained. (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258].) Here, there appears to be acquiescence on the part of N.H.F., so even though there is no showing of prejudice, such a showing would not be necessary to show laches.

However, even if we were to find that the action for declaratory relief was barred by laches, laches is not available as a defense to an action at law, though combined with the cumulative remedy of declaratory relief. (Code Civ. Proc., § 1062; *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 443, 462 [326 P.2d 484].)[6] Unlawful detainer is a legal action (2 Witkin, Cal. Procedure (2d ed.) Actions, § 78, p. 951) and therefore laches is not a bar to unlawful detainer.

## II

Appellant argues that the N.H.F.-Grant agreement, by merging Grant's rights under the master lease into the underlying fee, obviated an extension of the master lease in order to accommodate an extension of the sublease, and therefore the issue of whether Grant was obliged to extend the lease is moot.

Appellant's argument is unclear; it has no case citations, nor any citation to the record, and where there is no citation of authorities on the point made, the court may treat that particular point as waived, and pass

---

[6]*Abbott* was questioned on another point in *Benson* v. *City of Los Angeles* (1963) 60 Cal.2d 355, 364 [33 Cal.Rptr. 257, 384 P.2d 649].

on it without consideration. (See *Utz* v. *Aureguy* (1952) 109 Cal.App.2d 803 [241 P.2d 639].)

### III

██ ██ ██ ██ Appellant argues that the trial court erred in failing to grant P.N.S.'s motion for leave to amend its cross-complaint to allege a claim for interference with an advantageous contractual relationship and destruction of property.[7] P.N.S. has not set out the elements of such a cause of action. However, appellant P.N.S. should be permitted to amend.

██ In *Ramona Manor Convalescent Hospital* v. *Care Enterprises* (1986) 177 Cal.App.3d 1120, 1130-1132 [225 Cal.Rptr. 120], the court set out the elements of the tort as follows: "To establish Care's liability for intentional interference with contractual relations [IIK] or intentional interference with prospective economic advantage [IIPEA], Ramona was required to show: (1) a valid and existing contract with J&S [for IIK] or an economic relationship with J&S likely to produce a future economic benefit [for IIPEA], (2) Care's knowledge of this contract or relationship, (3) Care's intentional acts intended or designed to disrupt this contractual or economically advantageous relationship, (4) actual disruption of the relationship, and (5) resulting damages. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865]; *Shamblin* v. *Berge* (1985) 166 Cal.App.3d 118, 122-123 [212 Cal.Rptr. 313].)"

The court also said: "'Similarly, to prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove "*intentional* acts on the part of the defendant *designed* to disrupt the relationship." (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827, italics added; *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 126 [172 Cal.Rptr. 74]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18-19 [144 Cal.Rptr. 664].)

---

[7]Denial of a motion to amend a pleading is reviewable on appeal from a final judgment. (*Central Bank* v. *Transamerica Title Ins. Co.* (1978) 85 Cal.App.3d 859, 870 [149 Cal.Rptr. 822].

Appellants rely on *California Teachers' Assn.* v. *Governing Board* (1985) 169 Cal.App.3d 35, 43 [214 Cal.Rptr. 777], which held that a statutory limitation on the right to sue for each pension installment commences to run from the time each installment falls due. The court said it follows that even though "'Plaintiffs might have earlier brought suit for declaratory relief . . . their failure to do so does not operate to bar their right to declaratory relief with respect to future pension and monetary judgment . . . .'" We do not see how this case aids appellants. This is not a case where a plaintiff is suing for pension installments, or for only rental installments. In this case the appellants are suing also for declaratory relief, and that cause of action arose when the termination of the master lease terminated the sublease.

"'Only if and when plaintiff establishes an "intent to interfere" does the issue of "justification" come into play. (*Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d at pp. 18-19.) "[W]hile defendant's culpable *intent* is an element of the cause of action to be pleaded and proved by plaintiff, defendant's *justification* is an affirmative defense" in the torts of interference with an existing or prospective economic relationship. (*A.F. Arnold & Co.* v. *Pacific Professional Ins. Inc.* (1972) 27 Cal.App.3d 710, 714 [104 Cal.Rptr. 96].) It is here that defendant's *motive* for intentionally interfering becomes relevant. "Given the intention to interfere with the contract, liability usually will turn upon the ultimate purpose or object which the defendant is seeking to advance."'" (177 Cal.App.3d 1120, 1131-1132, italics in original.)

 P.N.S. has alleged conduct on the part of N.H.F. that could state a cause of action in intentional interference with economic relationships, and P.N.S. should be given an opportunity to amend.

## IV

We need not discuss N.H.F.'s argument about the cross-appeal since we reverse the judgment on the main appeal. P.N.S. is entitled to possession of the property under a renewal of the lease and is not subject to any damages but merely obligated to pay rent for the possession which we herein confirm.

The judgment is reversed. Appellants are entitled to costs pursuant to rule 26(a) of the California Rules of Court.

McClosky, J., and Arguelles, J., concurred.

A petition for a rehearing was denied December 30, 1986, and the petition of plaintiff, cross-defendant and appellant for review by the Supreme Court was denied March 11, 1987.